Isidore Weil and Another, Respondents, Appellants, *v.* Nettie M. Weil and Others, as Executors, etc., of Edmond Weil, Deceased, Appellants, Respondents.

First Department, November 29, 1929.

*Leon Lauterstein* of counsel [*Edmond E. Wise* and *Jesse B. Spiller* with him on the brief; *Wise & Seligsberg*, attorneys], for the plaintiffs.

*Frank H. Hiscock* of counsel [*Maurice Léon, Henry B. Twombly* and *W. T. Rutherford* with him on the brief; *Putney, Twombly & Putney*, attorneys], for the defendants.

O'MALLEY, J. Confronting us on this appeal is a record of five large volumes of testimony and exhibits and 979 pages of briefs of counsel. A review in detail of all contested questions of fact would result in an opinion of inordinate length. Moreover, such would have interest only for those directly concerned. In the circumstances, only the underlying facts on which our conclusions are based will be stated. Because of such limited treatment, however, it must not be assumed that all points raised have not been accorded full and fair consideration.

A special partnership which dealt in hides and skins conducted business in New York under the name of Alphonse Weil & Brothers, and in Paris under the name of Alphonse Weil et Frères. The plaintiffs were in charge of the Paris house, and the defendants' testator, hereinafter called the defendant, since 1915, was in sole charge of the New York branch. This action, begun in 1924, has resolved itself into one where both plaintiffs and defendant are

seeking an accounting of the business affairs of the respective branches of business. A referee appointed for the purpose has taken and stated the account and his report has been confirmed in all respects, save one, and upon this plaintiffs' appeal is based. The decree entered charges the defendant with an indebtedness to the partnership in the sum of $104,390.65 as of the 30th day of June, 1926, and provides for a further reference to take and state the account beyond that date.

The chief controversy is one relating to the rate of conversion of francs into dollars and *vice versa*. The issue has been rendered more acute because of franc depreciation following the World War. Were it not for such depreciation it is reasonable to suppose that the partnership, constituted principally of brothers, would have continued harmoniously and that the bitter hostility evinced between the parties throughout the record would never have obtained.

The rights of the parties are to be determined by the written articles of copartnership interpreted in the light of their unambiguous provisions, the surrounding circumstances, the conduct of the parties thereunder and also as affected by a so-called compromise agreement, reference to which will later be made.

The written copartnership agreement consists of two parts, the main and the so-called annex agreement, both dated July 21, 1914. The partnership's duration was to be from January 1, 1914, to December 31, 1923. It was to have a house with head office in Paris and a house with head office in New York, and was to be managed and directed by the four general partners, by a majority of whom decisions were to be taken. These general partners were to devote all their time and care to the business and were not to become interested directly or indirectly in any other, even though foreign to partnership purposes. Each was likewise forbidden " personal operations of mere speculation which might compromise his fortune or damage the credit of the partnership." The general partners were to withdraw a compensation of $5,000 for those of the New York house, and 12,000 francs for those of the Paris house.

At the head offices regular accounts of the operations of the partnership as to assets and liabilities were to be kept and a statement of each was to be made at least once a year at the end of December. After being transcribed on a specially provided register, a copy thereof certified to be correct was to be immediately forwarded or delivered to each of the partners and if not disapproved by them within two months after the closing of the books it would be deemed approved.

The general partners were each to take nineteen per cent of the

annual profits (with losses to be borne in like proportions), from which share there would be withdrawn three-eighths, two-eighths being added to the share of the partnership capital of that particular partner, and one-eighth to his current account. The amount put into the current account would draw five per cent interest and might be withdrawn only after notice given to the partnership.

It is to be observed that while there is no specific provision that five-eighths of the profits of each partner could be withdrawn, it follows as a natural consequence that such was the case.

The annex agreement provided that no business foreign to the partnership object might be closed without the unanimous consent of the partners. It further provided that both the Paris house and the New York house would be responsible for the regular forwarding of the extracts of the principal accounts and books each week or at least once a month, and that the books in both places would be audited by expert accountants every six months. Article 14 of the annex agreement, which has given rise to one of the most important disputes between the parties, provided that " The withdrawals in New York shall be converted at the rate of five francs to the dollar."

One of the issues litigated was whether the plaintiffs failed in their obligation to furnish to the defendant proper accounts under the provisions of the agreement. The record contains numerous letters between the parties upon this subject. They show that the defendant complained bitterly because statements were not regularly forwarded, and in turn, explanations offered by the plaintiffs are set forth. In brief, these were that war conditions had deprived them of competent bookkeepers and clerks and that the efficiency of their office force had been reduced to the minimum.

It is to be observed that the partnership agreements between the parties were executed before the outbreak of the World War. It is a fair inference that none of the parties had in contemplation the subsequent unprecedented interruption and a disturbance in business affairs, or, more particularly, the conditions already noted, that would later confront the Paris house. In the circumstances the plaintiffs could not fully comply with the strict letter of the obligation imposed in respect to the interchange of accounts. On the other hand, it is to be noted that even the defendant failed to meet the similar obligation imposed upon him.

The referee has found, and the evidence fairly sustains his conclusion, that neither house conformed strictly to the provisions of the agreement in the respects indicated. The correspondence shows that, as early as April, 1917, the plaintiffs were complaining of the delay in defendant's accounts and that such complaints

were frequent, and even the defendant himself admitted on one occasion the incompetency of his own staff of bookkeepers.

In the circumstances the fault of the defendant might be regarded as the more grievous, for the reason that conditions in New York were more favorable than those prevailing in Paris, and there was no apparent reason why his accounts should not have been properly kept. It would be quite impossible to review all the correspondence that passed between the parties on the matter in question or to hold that the referee was not justified in reaching the conclusion that he did. Nor does the evidence warrant a conclusion that the ultimate depreciation of the franc was in contemplation or considered possible when the partnership agreements were executed.

Four issues respecting franc conversions are presented: (1) Defendant's asserted right to convert withdrawals in New York at the rate of five francs for each dollar, as provided for in clause 14 of the annex agreement, irrespective of exchange fluctuation; (2) his asserted right to have his share of Paris franc profits converted into dollars at the end of each year at the average rate of exchange for such year; (3) his alleged loss due to franc depreciation on account of failure of the plaintiffs to transmit funds to the New York house for use in its business here; and (4) defendant's claim that francs to the extent of 240,000 voted him at the Paris house as additional salary for the six years immediately preceding October 7, 1921, should be converted at the prevailing rate of exchange at the end of each year to the extent of 40,000 francs each year.

Of these issues (1) was concededly covered by the compromise agreement of November, 1922, reference to which has already been made. If this agreement was valid and binding, therefore, this particular issue was once and for all settled. However, irrespective of the efficacy of such agreement we are clearly of the opinion that the defendant's position in this respect cannot be sustained. We agree with the finding made below that the provision for the conversion of dollar withdrawals in New York at the rate of five francs to the dollar contained in clause 14, already referred to, was a mere bookkeeping arrangement and is to be construed in connection with all the surrounding circumstances and particularly in the light of the general provision of the partnership agreements which look forward to equality among partners. As already noted, there was a provision that profits and losses as between the general partners should be equally divided. Even though it were not a mere bookkeeping arrangement the same result should obtain. The parties clearly contracted in the light of normal exchange conditions and upon the presumption that such would continue.

The fact upon which the provision was based having been removed the provision itself should fail. (*Lorillard* v. *C yde*, 1 2 N. Y. 456, 462; *Buffalo & L. Land Co.* v. *Bellevue L. & I. Co.*, 16 ; id. 247; 2 New York Law of Contracts, §§ 977, 978.)

We now come to the second issue, namely, the defendant's claim that he is entitled to be credited with his share of profits shown on the books of the Paris house at the end of each year at the average prevailing rate of exchange for such year. Assuming for the moment that such issue was not settled by the compromise agreement, our conclusion is that the defendant's contention in this respect is untenable.

As already noted, the fair purport of the original articles of copartnership is that each of the general partners would be entitled to a withdrawal at the end of each fiscal year of five-eighths of his profits. Unquestionably under this provision the defendant had a right, if he saw fit, to make such yearly withdrawal, and the plaintiffs so concede. It further appears that the defendant himself testified that he had a right under the agreements to withdraw his share of the Paris profits from the New York house at any time. Assuming therefore, for the sake of argument that the defendant was deprived of information sufficient to acquaint himself with his just share of the Paris profits during the years 1915 to 1918, owing to the plaintiffs' failure to furnish him with the exact status of his account, there remains the question whether he was in any way prejudiced.

It is the contention of the respondents that the evidence fairly shows that the defendant at no time was desirous of withdrawing his share of the Paris profits and the referee has found on sufficient evidence that the defendant at no time made demand for such profits. In fact, it appears that when an effort was made by the widow of the deceased partner, Aron Weil, in 1917, to have distribution to her of her interest, the defendant himself protested. Under date of October twenty-seventh of that year he wrote plaintiffs, clearly indicating that it was his attitude that, so far as possible, the assets of the partnership should be left undisturbed. In relating a conversation he had with her on the subject, he wrote: " When I tell her to be patient until after the war when everything will be put in order, and to enable us to well establish our enterprises with all our resources at our disposal, she answers me that she is not interested in that because she has not and does not expect to have any sons in the business the same as the others."

But if it be conceded that the defendant desired a withdrawal of his share of the Paris profits and was unable during the years 1915 to 1918 to do so, because of lack of knowledge as to their

exact amounts, the evidence fairly establishes that early in 1919 he had all the necessary information. At that time his son had been given free access to the Paris books and he brought with him to New York all information gained from bound books and so-called private accounts. These, when taken together, gave an accurate statement of the accounts of the partners and was later found by defendant's own accountants to be correct to the penny.

The defendant challenges these accounts and maintains that original memoranda on which they were based have been destroyed. Their accuracy, however, is made more probable by the fact that they showed greater profits and were more to defendant's favor than the bound books. There was no destruction of material memoranda but only of papers more or less in the nature of scratch sheets, etc.

When possessed of this information the defendant was in a position, if he so chose, to withdraw from New York his share of the Paris profits. The financial condition of the New York house was such as to warrant this conclusion. According to the plaintiffs' evidence it had assets over and above liabilities in excess of $1,000,000, and even according to the defendant's evidence, such assets in excess of $700,000. True it is, that the franc at such time had shown some depreciation and a withdrawal then would have given the defendant less in dollars than if he had been credited on the Paris books in dollars at the end of each of the preceding years, or had at such time withdrawn in dollars. However this may be, the fact that the defendant did not exercise his right is indicative of his own attitude towards the general policy of all the partners to retain intact, in so far as possible, the partnership assets until commercial conditions became more settled and business foresight clearer. At the times in question the ultimate trend of the franc was problematical, but there is evidence tending to show that all parties were hopeful that the cessation of hostilities would result in its restoration to normal.

But defendant further contends that even though he were content to allow his profits to remain firm assets, he is still entitled to have them computed in the manner outlined and placed to his credit in dollars at the end of each year. The referee regarded this contention as without merit and we agree with such conclusion. This claim is obviously brought forward merely because of franc fluctuation to defendant's disadvantage. As already noted, defendant never demanded actual payment of such share of his profits. The consolidated statements of the New York reports and those of the Paris books were merely to reflect the state of the firm's finances as a whole. The partnership did not provide that

distribution should be made either in francs or dollars. Defendant's acquiescence in the non-distribution of profits in fact must be regarded, moreover, as an acquiescence to this non-distribution through the fiction of a bookkeeping item. Taken as a claim for actual allocation or distribution or for a credit without actual distribution, defendant's contention should be overruled.

We now come to defendant's claim based upon an alleged loss due to franc depreciation on account of failure of plaintiffs to transmit funds to New York. Irrespective of the compromise agreement this point requires no lengthy discussion. In the first place this was clearly a matter of internal management of the partnership, the agreement for which provided for majority rule. Furthermore, the defendant had at all times sufficient capital in New York to meet all obligations including personal withdrawals to which he might have been entitled.

In October, 1921, plaintiffs wrote defendant that the accounts of the general partners had been credited in Paris with additional salaries for the six preceding years at the rate of 40,000 francs per annum. Defendant did not demur but he now contends that such should be credited to him at the rate of five francs to the dollar under clause 14 of the annex agreement. The latter, however, referred only to withdrawals in New York, and even in that respect has been disposed of in treating of defendant's contention as to conversion generally. In the main and annex agreements defendant's remuneration was specifically given in dollars. If such was intended to apply to additional remuneration, it should have been so provided.

Assuming for the sake of argument that our conclusion on these issues of franc conversion is not sustainable, there remains to be considered whether all were not included within the compromise agreement of November 20, 1922. In consideration of this question it is to be noted that agreements of compromise are generally favored by the courts. (*Post* v. *Thomas*, 212 N. Y. 264, 273; 2 Pom. Eq. Juris. [3d ed. 1905] § 850.) Especially should this view obtain where there is absence of fraud or mistake and where the differences claimed to be compromised were the subject of lengthy discussion and debate, and where, as here, all parties were represented by competent counsel.

First is involved the question of the validity of the agreement. Defendant's contention that the French law is applicable will be assumed to be correct. This was the apparent conclusion of the referee. As stipulated in the record, the French law of July 24, 1867, containing provisions relative to the publication of firm

instruments, requires that a duplicate or certified copy of an instrument creating any commercial firm shall be filed in certain designated places. It is provided that the formalities set forth are to be observed " under penalty of nullity towards the interested parties; but the default of any one of them may not be set up against third parties by partners." It is further provided that all instruments having for their object the dissolution before the term, and the mode of liquidation of the firm or its continuation beyond the term fixed, shall be subject to the formalities and the penalties above set forth.

Admittedly this compromise agreement, the provisions of which will be immediately stated, was not filed according to the provisions of such French law. The defendant maintains that as between the partners it is an absolute nullity according to the plain language of the statute.

Foreign law is a question of fact. Plaintiffs' experts in French law were of unquestioned standing. Their evidence is to the effect that the word " nullity " does not mean absolutely void *ab initio,* but that under French law an unfiled document would be valid until a judicial determination to the contrary, at the instance of one of the parties. Up to such determination, the agreement stands, and companies organized thereunder are regarded as *de facto* firms. All proceedings under such instrument until the determination of nullity would also be valid.

It is particularly to be noted that the original partnership articles were not filed in compliance with the French law, yet the defendant, writing to the plaintiffs in 1917, on this point, quoted his present counsel as stating that under the French law an accepted agreement, even though not registered, would " stand incontestible before the law."

It remains to consider what differences were composed by this agreement. As already noted, it concededly covered the question of the conversion of dollar withdrawals in New York. In our view it also comprehended all four issues respecting franc conversions heretofore detailed. Before referring to the evidence on which this conclusion is based, the agreement itself will be briefly considered.

It began with a recital to the effect that it was to " terminate the differences that have arisen on the subject of the construction of Clause No. 14 " of the main agreement, and " to settle the other questions " pending between the partners. It provided that New York withdrawals by the defendant up to December 31, 1919, should be converted into francs at the rate of five francs to the dollar and that the defendant's total so drawn should be deducted

from his share in the Paris profits, according to entries on the Paris books since 1914. Such New York withdrawals from January 1, 1920, to December 31, 1921, were to be converted by taking as the rate for the dollar the average between the rate of five francs and the average rate of the dollar during each respective year. For 1922 his withdrawals up to the amount of $33,000 were to be converted by taking as the rate for the dollar the average rate for the dollar per year, reduced by two francs, and above such sum, the conversion was to be at the rate of dollar average for the year, such total to be deducted from his franc profits in Paris. In addition, there was guaranteed to the defendant " an indemnity " of 250,000 francs " in order to conciliate the difference of interpretation on the conversion of *francs into dollars* " (italics ours), of which sum the defendant was to remit to one of the plaintiffs personally the sum of 100,000 francs. The agreement further provided that the partnership should be dissolved as of December 31, 1922.

Considering the provisions of this agreement in the light of what transpired between the parties before its final execution, our conclusion is that the parties intended thereby to settle not only the conversion of dollars into francs, but also the conversion of francs into dollars. To detail all the evidence bearing upon this question would add unnecessarily to the length of this opinion. Suffice it to say that as early as 1920 the question of the conversion of francs had been the source of discussion between the defendant and the plaintiffs in Paris. In 1922, while the plaintiff Isidore Weil and his son were in New York, all questions of exchange were fully discussed. At such time the defendant's bookkeeper, under his direction, prepared a statement showing the amount he could claim by converting his annual share of franc profits into dollars at the end of each year. Defendant's counsel at the same time drafted a proposed agreement which showed the surplus of the New York house in dollars and the Paris house in francs and which provided for an indemnity to the defendant of 190,000 francs. This agreement was signed by the defendant, but when taken to Paris, one of the plaintiffs refused to sign because it fixed no value on the good will of the New York house.

Following this, further negotiations continued in New York in May, 1922, and again in Paris in the same year, at which time the defendant himself admitted that he had discussed with the plaintiffs his claim for franc profits as they should have been established from year to year in Paris. Such discussion was full and in detail and the defendant testified that he was unable to come to any conclusion and that the matter was left undetermined when he

returned to New York. At such time the defendant had a further proposed agreement, whereby he proposed to abandon as concerned himself personally "his demand to convert his credit or debit balances of francs in Paris at the end of each respective year," and which also provided compensation to him in the sum of 250,000 francs, for "the loss which he suffers from the fact of his renunciation to convert into dollars the balances of his current accounts on his share of the franc profits in Paris at the end of each year at the average rate of exchange." This proposed agreement seems to have covered only conversion of franc profits in Paris, while the agreement which was finally signed refers generally to the "conversion of francs into dollars."

The defendant was represented in the final negotiations preceding the compromise agreement by his son, Charles Alphonse Weil, who acted with full authority. The latter admitted that he was fully aware that the agreement, as finally signed, contained a reference not only to clause 14, but also to "franc conversion." His claim that he understood that it referred only to the conversion of dollars into francs because he was so told by one of the plaintiffs, is not convincing.

It is interesting to note that immediately after the execution of this agreement and on December 1, 1922, the defendant, after his son had returned from Paris, wrote the plaintiffs expressing his delight that the question of exchange was "once for all ended."

Again on January 18, 1923, the defendant wrote plaintiffs confirming a cable which he sent them requesting the accounts be sent as of June 30, 1922, "upon the basis of our recent arrangement as to the rate of Francs to be applied to my withdrawals." In view of this evidence we are clearly of the opinion that the defendant by the agreement in question compromised for the sum of 250,000 francs his claim, whether valid or not, to have his balances in franc profits set up in dollars at the end of each year, and this, irrespective of his right to draw such balances at the end of each year, or to be compensated for his not having done so.

We are also clearly of the opinion that the defendant's claim that the compromise agreement was never recognized by the parties or carried out cannot be sustained. The evidence clearly warrants the finding that he himself recognized it in various ways. This is shown by his entering a credit to himself upon the New York books of 600,000 francs, representing his excess share on the Paris books and which entry included the 250,000-franc indemnity referred to in the compromise agreement; by specifically realizing thereon in part; by receiving and retaining without objection statements rendered to him by the plaintiffs avowedly in accordance

with the agreement of compromise; by the institution of an action in France in 1924 to recover his excess profits on the Paris books, which action he admitted was based upon the compromise agreement; and finally, by pleading in this very action the compromise agreement itself. It is true, of course, that upon the hearing before the referee, the defendant's counsel repudiated his pleading and elected not to stand upon the compromise agreement. While he was clearly entitled so to do, his original answer may be considered in the light of an admission and of a recognition up to that time, at least, of the validity of the agreement.

Upon the subject of franc conversion, there remains to be considered but one question, namely, the claim of the defendant that even assuming the validity of the compromise agreement and its binding effect on the parties, he was entitled to have annual conversions during the years subsequent to 1922. His contention in this respect may not be sustained. The compromise agreement purports to settle all differences, and in the words of the defendant himself " once for all." Under the defendant's contention the matter of conversion would not be settled once for all, but would within a few weeks after making the agreement again be the subject of controversy. Moreover, the evidence clearly shows the defendant at no time during the years 1923 or 1924 ever questioned the finality of the compromise agreement on this question, although he received from Paris the accounts for 1921, 1922 and 1923, all based upon the plaintiffs' interpretation of the agreement.

We have not overlooked the contention that the dissolution provided for in the compromise agreement was not effected, and that for this reason its provisions should be wholly disregarded. In this we again agree with the view of the referee that there was contemplated at the time of its execution plans for a general reorganization of the business and the carrying on in the meantime of business by both houses, liquidation in the meantime to be delayed. The conduct of the parties following its execution lends support to this understanding and, as well said by the referee: ' All parties regarded the agreement as of unquestioned validity, and each held the other to its performance. The dilatory method of proceeding with the liquidation after the dissolution date of December 31, 1922, furnishes no justification for defendant's contention. The mere postponement of final liquidation by both parties certainly cannot affect the binding force of the agreement in other respects."

We deem it unnecessary to consider separately each controverted question or item dealt with by the referee in his opinion. Of these

there are approximately fourteen not here specifically discussed. A consideration of each in detail would serve no useful purpose. Of these, some have been resolved in favor of the defendant. In so far as others have been decided against him, the report and findings of the referee disclose a careful consideration of the evidence and of the defendant's contentions in respect thereto. The disposition thus made discloses a fair and equitable result.

Nor are we inclined to modify the judgment in so far as it fails to follow the recommendation of the referee respecting the deposit of the defendant of such sums for which he may be found to be accountable. Undoubtedly the court would have power to so order in a proper case, but we do not deem the circumstances disclosed in this record to be so cogent as to compel us to find that the court committed an abuse of discretion in refusing so to do. Whether such or similar relief might be appropriate on other facts and circumstances, we do not now determine.

The judgment should, therefore, be affirmed, with costs to the plaintiffs.

DOWLING, P. J., FINCH, MCAVOY and MARTIN, JJ., concur.

Judgment affirmed, with costs to the plaintiffs.