AUTOWEST, INC., Plaintiff-Appellee,

v.

PEUGEOT, INC., Defendant-Appellant,

and

Associete De Automobiles Peugeot, Defendant.

No. 770, Docket 34406.

United States Court of Appeals, Second Circuit.

Argued June 1, 1970.

Decided Nov. 18, 1970.

Stanley Geller, New York City (Buchner, Fassler & Oestreicher, Leonard J. Fassler and Norman Fassler, New York City, on the brief), for plaintiff-appellee.

Alexis C. Coudert, New York City (Coudert Brothers, New York City, on the brief), for defendant-appellant.

Before LUMBARD, Chief Judge, and SMITH and KAUFMAN, Circuit Judges.

LUMBARD, Chief Judge:

Peugeot, Inc., a New York corporation and wholly owned subsidiary of the French automobile manufacturer Associete De Automobiles Peugeot, imports Peugeot automobiles and parts from France and sells them in the United States through an organization of distributors and dealers. Autowest, Inc., a California corporation, was Peugeot's franchised distributor in the nine western states, including California and Washington, from October, 1964, until its status was terminated on February 15, 1966.

Upon termination, Autowest promptly commenced this suit in the Eastern District of New York, alleging (1) breach of contract; (2) termination in violation of the so-called Automobile Dealers' Day in Court Act, 15 U.S.C. §§ 1221–1225; and (3) termination in violation of New York General Business Law § 197. On March 29, 1966, following extensive hearings, Judge Dooling denied Autowest's application for a preliminary injunction, 287 F.Supp. 718. On September 10, 1969,

notice was served to substitute the law firm of Buchner, Fassler & Oestreicher as Autowest's attorneys. Peugeot promptly moved to disqualify the firm under the Canons of Ethics, on the ground that Leonard J. Fassler, Esq., a partner in the firm, was secretary and a substantial stockholder of Autowest, and that he will "be an essential witness on behalf of plaintiff at the coming trial and his credibility will be very much at issue." On September 18, 1969, Judge Dooling denied the motion.

Trial was begun before Judge Dooling and a jury on October 14, 1969. At the close of plaintiff's case, Judge Dooling dismissed the first cause of action for breach of contract. On October 27, the jury, in answer to a special interrogatory, found Peugeot liable under both the federal and state acts, and awarded $500,000 damages not including interest. Judgment was entered on the verdict, and the defendant appeals.

Peugeot makes four arguments: (1) the evidence failed to establish liability under either statute; (2) plaintiff's proof of damages was neither admissible nor sufficient; (3) Fassler should not have been permitted to represent Autowest; (4) written evidence of complaints from dealers about Autowest was improperly refused.

We affirm the judgment under the Automobile Dealers' Day in Court Act, and consequently find it unnecessary to decide whether recovery would also be warranted under New York General Business Law, McKinney's Consol.Laws, c. 20, § 197.[1]

## I.

The facts, viewed most favorably to the plaintiff, as they must be, are as follows: Before he became Autowest's president and principal stockholder, Joseph Anzelon was the general manager of the parts and service division of World-Wide Automobile Corporation, the Volkswagen distributor for New York, Pennsylvania, and Connecticut. Anzelon had been with World-Wide from its inception, and thus was a high official in a tremendously successful organization. In early 1964, Anzelon began discussing with officials of Renault, Inc. the possibility of becoming Renault's distributor in the Far West. Anzelon also met with Henri Combe, executive vice-president of Peugeot, Inc., and other Peugeot officials, to become a Peugeot distributor. Anzelon explained to Combe that he would follow the policies that had made Volkswagen successful. Specifically, he intended to develop a quality dealer organization and to eliminate all bad dealers so as to improve Peugeot's reputation in sales and service. Combe, dissatisfied with Peugeot's performance in the West, agreed to go along with Anzelon. Both parties realized that this policy would necessarily mean a substantial decline in sales and number of dealers, as well as considerable operating losses, in the first year or two. Anzelon also informed Combe that he would be unwilling to move to Los Angeles and make the necessary investment unless the franchise was on a long-term basis of at least ten years.

With the understanding that he would receive a Peugeot franchise, Anzelon negotiated the purchase of all shares of Renault's 100% subsidiary, Renault West, which had been the distributor of Renault and Peugeot in that area for several years. On October 1, the stock purchase agreement was consummated.

---

1. Section 197 provides:
   "No manufacturer or distributor, or any agent of such manufacturer or distributor, shall terminate any contract, agreement, or understanding or renewal thereof for the sale of new motor vehicles to a distributor or dealer, as the case may be, except for cause."
   At an advanced stage of the trial, the parties and the trial judge first realized that a difficult question was presented: whether New York courts would apply this law to protect a franchise operating wholly outside New York. Since the jury found liability under both statutes, Judge Dooling never had to rule on the issue.

Anzelon paid $100,000 in cash and executed approximately $374,000 in promissory notes. He also guaranteed a note for $325,694 from Renault West to Renault, Inc. Renault West was appointed distributor of Renault and Peugeot products on that date, and changed its name to Autowest.

The franchise agreement between Peugeot and Renault West (or Autowest) provided:

"32. This agreement shall continue for a period of one year from the effective date set forth at the foot of the agreement, unless terminated prior to that time according to any other provision of the agreement."

However, apparently because of Anzelon's desire for a long-term arrangement, the standardized franchise agreement was supplemented by a collateral letter-agreement executed the same day, providing:

"Notwithstanding the provision of Chapter L, Paragraph 32, of the Distribution Agreement, neither party will give notice of termination or terminate the said agreement except for good faith cause within the meaning of the Automobile Dealers Day in Court Act * * *. However, the parties shall execute a new Distribution Agreement in September of each year, during which your corporation continues to be a Peugeot distributor."

Anzelon took over a chaotic and inefficient distribution system. He immediately instituted vigorous measures to upgrade the quality of sales and service and to terminate dealers who were unsuitable. Numerous disagreements with Peugeot developed in such areas as suggested retail price, signs to be used by dealers, advertising policy, and the proper size of Autowest's inventory. These disagreements were substantially settled at meetings of June 3 and November 29, 1965.

On September 30, 1965, the anniversary of Autowest's franchise, Combe sent Anzelon a letter suggesting a 30-day extension of the agreement pending a meeting, in view of the "differences of opinion" between the two companies. These differences were aired at the November 29 meeting. Anzelon never responded to the 30-day extension proposal. In October Combe asked for an explanation for Autowest's charging its dealers $40 over Peugeot's suggested distributor's price, and Anzelon replied that this had been in effect since June. At the November 29 meeting, Combe again raised the issue of the extra $40 mark-up. Anzelon explained that this money would be used as a reserve for advertising, and agreed to keep Peugeot informed of the use made of this fund.

In early December, 1965, Autowest began discussions with Renault, Inc. regarding termination of the Renault franchise. In order to decide their future course, the Autowest officials tried to estimate what their prospects would be if they continued solely as a Peugeot distributor. Based on their deliberations, Robert Farinelli, the comptroller, drew up a ten-year income projection which showed that Autowest could recoup all losses and make substantial profits. At that time, Autowest, like its predecessor Renault West, continuously showed losses.

Combe was kept informed of the Renault negotiations. When advised that a stock sale was being considered, Combe replied that this could create a problem in that the Peugeot franchise might remain with the corporation. At the end of December, 1965, Fassler called Combe to ask whether the Peugeot franchise would be affected by the Renault sale. In reply, Combe asked what Autowest's policy would be with respect to its dealer price. Fassler informed him that Autowest would go along with the suggested price. Apparently, the parties misunderstood each other. Combe had in mind the price charged by Autowest to dealers, while Fassler thought he was concerned with the suggested retail price. On January 3, 1966, Anzelon sent Combe a copy of Autowest's circular to dealers, which showed that the $40 mark-up was still being charged.

On January 10, 1966, Autowest and Renault signed a termination agreement, which included a sale to Renault of a considerable portion of Autowest's assets. Autowest's debt to Renault was cancelled, and Anzelon's indebtedness was reduced. Because the purchase price was keyed to the value of the assets sold, the closing was not effectuated until February 13, 1966. When he was informed of the agreement on January 10, Combe immediately wrote to Autowest requesting a certified year-end financial statement and also a certified statement giving effect to the asset sale. He further asked that information as to the projected assets and liabilities of Autowest be sent to him within ten days. Around January 15, Fassler delivered to Peugeot a pro forma financial statement giving effect to the Renault transaction, which included $100,000 in cash representing the additional investment which Autowest's officers intended to put into the business as soon as the asset sale was consummated. Peugeot was not informed that this $100,000 was not already in the business.

During the latter part of January, 1966, Combe visited Autowest at its new premises in Long Beach. Combe became very angry at Autowest's mark-up to its dealers, and, because of his misunderstanding with Fassler in their December telephone conversation, he called Anzelon a liar. When asked whether he was dictating the price Autowest must charge to its dealers, Combe replied that he knew the American law and would not be trapped into answering. From this point, if not earlier, the Autowest-Peugeot relationship quickly deteriorated. After spending a few days in San Francisco, Combe returned to Long Beach. He apologized for his language during the previous visit. A shipment of cars was due to arrive in Seattle. In Anzelon's presence, Combe turned the shipping documents over to Peugeot's Far West representative, James MacLaughlin, with instructions not to give them to Autowest until full payment was received.

On February 8, 1966, Peugeot's California attorneys demanded that its accountants be permitted immediately to examine Autowest's books. After consulting with Farinelli, the comptroller, and determining that everyone was too busy with the Renault valuation, Fassler refused. The Seattle shipment arrived on February 10, and was paid for on February 14. The next day, Peugeot terminated Autowest's status as distributor, listing numerous reasons under four main headings: insufficiency of sales organizations; failure to perform the distributor's function adequately; decline in sales; breach of the distribution agreement.

## II.

Peugeot claims that there was insufficient evidence of lack of "good faith" to warrant recovery under the Automobile Dealers' Day in Court Act, 15 U.S.C. §§ 1221–1225. The Act allows an automobile dealer to sue an automobile manufacturer in federal court to recover damages for failure of the manufacturer:

> "to act in good faith in performing or complying with any of the terms or provisions of the franchise, or in terminating, canceling, or not renewing the franchise with said dealer: * * *"

*Id.* § 1222. The parties agree that Peugeot and Autowest fit the statutory definitions of manufacturer and dealer respectively, *id.* § 1221(a), (c). "Good faith" is defined, *id.* § 1221(e), as:

> "the duty of each party to any franchise, and all officers, employees, or agents thereof to act in a fair and equitable manner toward each other so as to guarantee the one party freedom from coercion, intimidation, or threats of coercion or intimidation from the other party: *Provided,* That recommendation, endorsement, exposition, persuasion, urging or argument shall not be deemed to constitute a lack of good faith."

Autowest's theory, as argued to the jury, was that Peugeot tried to coerce

it into following the suggested distributor price to dealers. Autowest's failure to go along was the real reason for termination, and not the grounds enumerated in Peugeot's termination letter of February 15, 1966.

Judge Dooling charged the jury, without exception, that in order to recover, plaintiff must prove three things: (1) that defendant threatened to terminate or not to renew Autowest's franchise in order to coerce Autowest into following Peugeot's price preference; (2) that Peugeot did terminate or fail to renew the franchise for this reason, and not because it considered Autowest's performance unsatisfactory; and (3) the termination caused monetary damages.

█ Although Peugeot did not object to the charge, a few observations are in order as to why we think the charge was correct in the context of this case. The charge properly recognized, in accordance with case law and legislative history, that the statutory duty to act in a "fair and equitable manner" must be considered in the context of "coercion, intimidation, or threats," and a causal connection between the dealer's resistance to the coercive conduct and the termination is required. E. g., Kotula v. Ford Motor Co., 338 F.2d 732 (8th Cir. 1964), cert. denied, 380 U.S. 979, 85 S.Ct. 1333, 14 L.Ed.2d 273 (1965); H.R.Rep. No. 2850, 84th Cong., 2d Sess. (1956), 3 U.S.Code Cong. & Admin.News, 1956, p. 4603. But more is required than coercion and subsequent termination for failure to submit, for otherwise the manufacturer would be precluded from insisting upon reasonable and valid contractual provisions. Woodard v. General Motors Corp., 298 F.2d 121 (5th Cir.), cert. denied, 369 U.S. 887, 82 S.Ct. 1161, 8 L.Ed.2d 288 (1962).

█ While each case necessarily presents questions as to the Act's reach, we hold that coercion and subsequent termination for failure to adhere to a manufacturer's suggested resale price to dealers states a cause of action. Autowest contends that this is a simple case, because Peugeot's exercise of power to enforce resale price maintenance runs afoul of the antitrust laws, citing United States v. Parke, Davis & Co., 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960). This reading of *Parke Davis* is too broad, as the case involved retail price maintenance. The Court held that Parke Davis created an illegal combination under the Sherman Act in enlisting the wholesalers, by refusal to deal, to stop the flow of Parke Davis products to the retailers in order to induce retailer adherence to its suggested retail prices. The court noted that the simple refusal, without more, to sell to wholesalers who did not follow its policies would not have violated the Act. 362 U.S. at 45–46, 80 S.Ct. 503. Nevertheless, the fact that this is a fringe area of antitrust law is an important factor in our conclusion that the coercion and termination in this case are unlawful, for the Automobile Dealers' Day in Court Act was designed in part to supplement the antitrust laws. H.R.Rep. No. 2850, 84th Cong., 2d Sess. (1956), 3 U.S.Code Cong. & Admin. News, 1956, p. 4596; see Kessler & Stern, Competition, Contract, and Vertical Integration, 69 Yale L.J. 1, 109 (1959) ("a plan of violation of the spirit of the antitrust laws").

█ Second, we consider this termination actionable on the basis of reasoning analogous to the First Circuit's decision in Volkswagen Interamericana, S. A. v. Rohlsen, 360 F.2d 437, cert. denied, 385 U.S. 919, 87 S.Ct. 230, 17 L.Ed.2d 143 (1966), which held that termination because Rohlsen would not accept defendant as a partner upon unreasonable terms was a clear violation of the Act. The court distinguished two kinds of conditions: those which benefit solely or primarily the manufacturer, such as requirements that the dealer purchase a large stock of vehicles; and requirements that work to the mutual advantage of both parties, for example, that the dealer improve his service. The former is "[p]articularly suspect," can be easily extorted by the manufacturer at the dealer's expense, and was of especial

concern to Congress. 360 F.2d at 442. Here, a low gross profit margin for the distributor arising from coercive enforcement of the suggested distributor's resale prices would have primarily benefited Peugeot at Autowest's expense.

We reject Peugeot's claim that the evidence was insufficient to support a jury verdict for plaintiff. Anzelon, Autowest's president, testified that at the first January meeting in Long Beach, Combe was very angry about Autowest's failure to follow Peugeot's price preference. Combe then allegedly said the distributorship might be in jeopardy if Autowest didn't follow the price preference. Anzelon then asked, in substance, whether Combe was insisting on dictating the price he must charge his own customers. Combe replied that he knew the American law and would not be trapped into answering. This was the only subject discussed at the meeting.

Combe's testimony did not greatly differ from Anzelon's version of the January meeting. He admitted calling Anzelon a liar. He agreed that in answering Anzelon's question, he had stated that he would not be trapped under American law. However, he emphatically denied saying that the distributorship might be in jeopardy. He explained that "liar" is not such a bad word in French; when he learned that it was a harsh word in English, he promptly apologized at the second meeting a few days later.

Peugeot argues that the one sentence of testimony in a large record concerning Combe's termination threat is insufficient. But the jury was entitled to credit Anzelon's version, and thus find that the alleged threat was made. Moreover, in light of Combe's own admissions that he used harsh language and stated he would not be trapped under American law, they could disregard his disclaimer of coercive threats. Peugeot further argues that the credibility of Anzelon's "refreshed recollection" must be judged in light of his deposition testimony. In fact, that testimony supports rather than damages his credibility. He deposed: "[T]he subject of our direct distributor-ship came up and its relationship to the Renault transaction. To my direct inquiry whether or not there was going to be any problem whatsoever, Mr. Combe * * * blew his stack concerning our charging a different price than his suggested one to the dealers."

Defendant further argues that the price disagreement must be considered in light of the amicable October and November 1965 letters and meeting at which the price was discussed, and the fact that another Peugeot distributor refused to follow the suggested price. But these same facts could be viewed quite differently, especially when the December conversation between Fassler and Combe and the critical January meeting with Anzelon are considered. The jury could conclude that whenever the subject of continuing the franchise arose, the first question Combe always raised concerned the price to dealers. In fact, in view of this background, as well as the obviously strained relations between the parties soon followed by termination, Judge Dooling's instructions to the jury, confined to requiring them to find an explicit threat, were probably more favorable to Peugeot than necessary. Autowest had signed its agreement with Renault, and Peugeot had made it clear that it considered Autowest's franchise status shaky. When Combe then came to Long Beach to discuss mainly the resale price, even words that on their face are "urging or argument" protected by the Act's proviso could be construed in this context to be an unlawful threat of termination, understood as such by both parties. See Note, Statutory Regulation of Manufacturer-Dealer Relationships in the Automobile Industry, 70 Harv.L.Rev. 1239, 1250 (1957).

Peugeot also argues that it had many valid reasons to terminate Autowest, as shown by the termination letter. But the jury could conclude, as they obviously did, that these were not the true reasons for termination. Plaintiff's evidence, if believed, effectively rebutted many of the asserted reasons. For example, the letter pointed to a decline of

sales and dealerships, whereas Anzelon had made it clear prior to becoming the distributor that short-term declines were necessary to build a quality dealer organization, and Combe agreed. Other "failures" listed in the letter apparently were worked out long before February 15, 1966, or were mere temporary inadequacies caused by the Renault termination.

■ Peugeot cites several cases to show that under the Automobile Dealers' Day in Court Act, actions have been dismissed where there was "more substantial evidence of a threat, coercion or intimidation than the remark attributed to Combe herein." Although all these cases are distinguishable, we deem it appropriate to add that notwithstanding some intimations in other opinions to the contrary, we can see no basis for confining the jury to a more limited role in the fact-finding process in suits under the Act than in other cases. In Kotula v. Ford Motor Co., 338 F.2d 732 (8th Cir. 1964), cert. denied, 380 U.S. 979, 85 S.Ct. 1333, 14 L.Ed.2d 273 (1965), plaintiff failed to establish that termination was imposed in retaliation for the dealer's refusal to accede to earlier threats made by lower-echelon Ford officials. The termination file revealed a long history of difficulties which would justify termination, including plaintiff's failure to devote full time to the business. After extensive investigation, a Dealer Policy Board heard and rejected plaintiff's appeal; the Board was certainly not a party to an unlawful scheme. In Garvin v. American Motors Corp., 318 F.2d 518 (3d Cir. 1963), plaintiff failed to show any coercion or threats whatsoever. Berry Bros. Buick, Inc. v. General Motors Corp., 257 F.Supp. 542 (E.D.Pa. 1966), aff'd per curiam, 377 F.2d 552 (3d Cir. 1967), merely held that arbitrary non-renewal alone is not actionable. In Victory Motors of Savannah, Inc. v. Chrysler Motors Corp., 357 F.2d 429 (5th Cir. 1966), the only evidence adduced showed that Chrysler threatened to terminate and did terminate because the dealer failed to sell a sufficient number

of cars as specified in the contract. Woodard v. General Motors Corp., 298 F.2d 121 (5th Cir.), cert. denied, 369 U. S. 887, 82 S.Ct. 1161, 8 L.Ed.2d 288 (1962), upheld a termination for failure to move to adequate facilities as had been promised for over a year. Clearly, none of these cases is contrary to our holding here.

■ Finally, Peugeot contends that since the written franchise contract expired on October 1, 1965, and no new contract was executed, recovery is barred under the Act. The Act provides recovery for termination of a "franchise," which is defined as a "written agreement or contract." 15 U.S.C. § 1221(b). This argument must be rejected for two reasons. First, even if the relationship between the parties became a relationship at will subsequent to October 1, 1965, it was still governed by the terms of the original written franchise agreement. Second, the interpretation urged upon us by defendant would effectively read out of the statute the cause of action for "not renewing the franchise," 15 U.S.C. § 1222. Southern Rambler Sales, Inc. v. American Motors Corp., 375 F.2d 932 (5th Cir.), cert. denied, 389 U.S. 832, 88 S.Ct. 105, 19 L.Ed.2d 92 (1967), and Alfieri v. Willys Motors, Inc., 227 F.Supp. 627 (E.D.Pa.1964), cited by Peugeot, were cases involving alleged oral agreements in conflict with the written terms. The Act's legislative history shows that this is precisely what Congress wanted the federal courts to ignore in providing that only breach or termination of written agreements were actionable. See H.R.Rep. No. 2850, 84th Cong., 2d Sess. (1956), 3 U.S.Code Cong. & Admin.News, 1956, p. 4601; Note, Statutory Regulation of Manufacturer-Dealer Relationships in Automobile Industry, 70 Harv.L.Rev. 1239, 1246–47 and n. 63 (1957).

### III.

In summation, Autowest urged the jury to find that its calculation of damages based on projections by Autowest officials, showing lost profits over a ten-

year period of $1,575,897, was reasonable and conservative. Peugeot's summation contended that Autowest would never have realized a profit, and that it suffered no damages because of the termination. The jury awarded $500,000 in damages and, after adding interest, judgment was entered for $611,000. Peugeot vigorously attacks the sufficiency of the evidence to support the jury's award of damages, and the admissibility of that evidence.

The evidence to which Peugeot objects includes: first, Joseph Anzelon's testimony concerning a projection he made in December, 1965, of the increased number of dealers and Peugeot sales per month over the succeeding ten-year period; and second, comptroller Farinelli's income projection prepared at the time showing that on the basis of Anzelon's sales figures, Autowest would make a substantial profit, over $1.5 million, during the ten-year period. These projections were prepared in December, 1965, at a time when Autowest officials were weighing the advisability of selling the Renault part of the business to Renault, Inc. and continuing solely as a Peugeot distributor.

Anzelon testified that he prepared his sales projection by first projecting the number of dealers he would have in each year, starting at 40 in the first year, 1966, and reaching 100 in the fifth year, no new dealers being added thereafter. He based this projection upon his own inquiries, including conversations with prospective dealers, and his experience in the western area market. In addition, with the aid of a Volkswagen survey, he identified 273 different markets in his area which had the potential for supporting a car dealership, and in which there already existed a dealership for a major imported automobile. Out of these, the 100 largest were chosen, each with a population exceeding 50,000 inhabitants. He then prepared the average monthly sales projection, which increased from 55 in 1966, to 65 in 1967, 100 in 1968, and eventually 350 in the tenth year. Anzelon explained that the number of cars per month was based on the Autowest experience of past averages of car sales per dealer. Between the second and third years, while no new dealers were to be added, increased advertising and additional district managers would produce increased sales. Again, between years 5 and 10, these same factors would double sales, representing an increase from 1.75 to 3.5 cars sold per month per dealer.

Anzelon then met with his brother George, who was vice-president; Harold Miller, the dealer operations manager; and comptroller Farinelli to estimate important operating expenses. Following this meeting, Farinelli completed the income projection as follows: Anzelon's monthly sales figures were multiplied by Autowest's average gross profit per vehicle to arrive at the gross profit for vehicle sales. The gross profit on parts sales was calculated as increasing in proportion to the increase in number of vehicles sold. Direct costs such as wharfage and handling were deducted. The estimated expenses were then deducted from this figure to arrive at net income. Salaries were calculated on the basis of Autowest's experience and the officers' knowledge of required salary levels. Advertising was figured on a per car basis by Joseph Anzelon, with the amount per car increasing over the years. The Autowest experience and Farinelli's knowledge were also used to estimate such other items as office supplies and postage, rent, utilities, telephone and telegraph, repairs and maintenance, insurance and bad debts.

Peugeot first argues that the projection was admitted by the court as relevant only to whether or not Autowest intended to continue in business with Peugeot, and not in any way as proof of the profits themselves. We think that this is not a fair reading of Judge Dooling's instruction to the jury at that time, which is set forth in the margin.[2] Ex-

2. "It will be received in evidence for a limited purpose of showing that the men whose names have been mentioned said and did what they did say and do and

tensive testimony and voir dire examination, together with exhaustive colloquy with counsel, was not needed to admit the document for that purpose. Moreover, we will not lightly assume that Judge Dooling would admit a document so highly damaging to defendant in order to establish a point not seriously disputed. Rather, it is clear that the trial judge was merely cautioning the jury against taking this projection as gospel truth. In any case, it is apparent that, by the end of the trial, the projection was used for a broader purpose, since both parties in summation argued the projection's validity, and Judge Dooling charged the jury: "Bear in mind that neither plaintiff's forecast, nor the experience of Peugeot Western Distributors in 1966, 1967, and 1968 are to be taken as decisive things one or the other of which is right and must be chosen."

■ We hold that both Anzelon's sales projection and Farinelli's income projection were properly received into evidence, and could be considered by the jury in evaluating Autowest's damages. First, "a defendant whose wrongful conduct has rendered difficult the ascertainment of the precise damages suffered by the plaintiff, is not entitled to complain that they cannot be measured with the same exactness and precision as would otherwise be possible." Eastman Kodak Co. v. Southern Photo Materials Co., 273 U.S. 359, 379, 47 S.Ct. 400, 405, 71 L.Ed. 684 (1929). The wrongdoer should bear the risk of uncertainty that his own conduct has created. Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 264–265, 66 S.Ct. 574, 90 L.Ed. 652 (1946). In William H. Rankin Co. v. Associated Bill Posters, 42 F.2d 152 (2d Cir. 1930), cert. denied, 282 U.S. 864, 51 S.Ct. 37, 75 L.Ed. 765 (1931), this court allowed plaintiff to show by the testimony of its treasurer what he considered would have been the normal increase of the business each year absent defendant's unlawful interference, and from that to estimate probable yearly earnings between 1913 and 1918, based on the net profits in 1911. The court stated:

"This evidence, while purely an estimate and introduced as such, was proof of a kind as definite and certain as the subject-matter admitted. It had to do with what was never actually earned because of defendants' wrongdoing. The witness testified from his knowledge of the business history, made his calculations upon what appears to be a reasonable basis, and the defendants had ample opportunity by cross-examination or the offer of their own evidence on the subject to discredit him and show any fallacy in his reasoning or testimony. Whatever may be said of its weight, and that was entirely for the jury, we have no difficulty with its admissibility."

42 F.2d at 155; accord, Bordonaro Bros. Theatres, Inc. v. Paramount Pictures, Inc., 176 F.2d 594 (2d Cir. 1949).

had this document prepared for the purpose that they did prepare it.

"Now I think Mr. Rand's voir dire has pointed out what he conceives to be the inadequacies, the weaknesses and the lack of foundation for it, but it is received in evidence because whether good, bad or indifferent, it was prepared for the use of these men in their making up their minds about what they wanted to do with respect to the Peugeot franchise which they then enjoyed or thought they enjoyed.

"Now, that does not mean that this is a deep-minded, thoughtful or valid projection.

"It does indeed not even mean that you have to accept as gospel the statement that was the purpose and occasion of the preparation of the document. All these things are matters of fact which you must determine, and above all, you must not take this as a faithful portrait of a future certain-to-come pass, and I think Mr. Fassler would be the first to agree with the defense counsel that it does not have that force or effect. It is what it is, with weaknesses or strengths that you determine that it has in the light of all of the circumstances; but it is neither a record of past events and in that sense a 'true record,' for it is not a record of any past event nor is it a true portrait of the future, for no man can portray the future, as all of us have so sadly learned in the length of time we have been on this earth."

Courts draw the distinction between proof of damages allowing the jury to make a "just and reasonable inference" and "pure speculation or guesswork." Bigelow v. RKO Radio Pictures, Inc., *supra*, 327 U.S. at 264, 66 S.Ct. 574; Clapper v. Original Tractor Cab Co., 270 F.2d 616 (7th Cir. 1959), cert. denied, 361 U.S. 967, 80 S.Ct. 588, 4 L.Ed.2d 547 (1960). While this line cannot be exactly drawn, and each case must accordingly turn on its unique facts, elements which have impelled courts to exclude evidence or overturn verdicts may be gleaned from an examination of some of the cases cited by Peugeot. Thus, in Herman Schwabe, Inc. v. United Shoe Mach. Corp., 297 F.2d 906, 910–912 (2d Cir.), cert. denied, 369 U.S. 865, 82 S.Ct. 1031, 8 L.Ed.2d 85 (1962), we held that the testimony of plaintiff's economist was properly excluded because it rested on assumptions that ranged from demonstrably false to unreasonable and contrary to common sense. In Baush Mach. Tool Co. v. Aluminum Co. of America, 79 F.2d 217, 227 (2d Cir. 1936), the witness was asked to assume a reasonable prospect of profitable operation in assessing the value of the plant. There was no attempt to introduce evidence which would justify that assumption, whereas all evidence pointed against profitability, and therefore the testimony was held inadmissible. In Flinkote Co. v. Lysfjord, 246 F.2d 368 (9th Cir.), cert. denied, 355 U.S. 835, 78 S.Ct. 54, 2 L.Ed.2d 46 (1957), there was no evidence of what similar businesses did in the relevant period. The sole evidence adduced was the testimony of plaintiffs, both inexperienced in business operations, based on inaccurate computations of the most money they had made working as salesmen for an established firm, with no attempt being made to compare either the businesses or the years. Despite the obviously frivolous nature of this evidence, the court's precise holding was "only that * * * the record must show their competency and the factual basis upon which they rest their conclusion." 246 F.2d at 394.

Applying these principles to the present case, the evidence offered, although weak, was properly admitted. Joseph Anzelon, for ten years an executive with a major Volkswagen distributor and experienced as Autowest's president, was certainly qualified to testify. Farinelli, as Autowest's comptroller, was familiar with the distributorship's income and expenses. Anzelon and Farinelli set out at length the bases from which they derived their figures, and consequently Peugeot was able to cross-examine them vigorously. These projections were no mere "interested guess" prepared with an eye on litigation. Instead, they were the product of deliberation by experienced businessmen charting their future course. In December, 1965, Autowest reached a critical juncture; the officers had to decide whether it would be profitable for them to remain in California as a Peugeot distributor if the Renault sale were consummated. The projections were used to arrive at the conclusion to proceed, and they acted upon it.

Undoubtedly there are facets of these projections that are entitled to little weight. For example, Peugeot convincingly demonstrated by its own testimony and by cross-examining plaintiff's witnesses that the projected advertising expense for the first few years was too low. Salaries probably were too low as well. Defendant also cast doubt on Anzelon's projection of a monthly car sales increase from 65 to 100 between the second and third years. But on the whole, Anzelon and Farinelli could account for each of their figures on the basis of investigations and inquiries, their own knowledge, and non-frivolous assumptions they had made. Peugeot's brief characterizes these estimates as a "pipe dream," but we think that this was for the jury to determine. We also decline to rule as a matter of law that Autowest's method of computation, multiplying its average gross profit per car in 1965 by the estimated future sales, and deducting estimated expenses, is unreasonable. Cf. Eastman Kodak Co. v. Southern Photo Materials Co., 273 U.S.

359, 379, 47 S.Ct. 400 (1927). The method of computing increased parts sales and gross profit, keyed as it was to increased car sales, was also acceptable evidence. Peugeot's theory that increased parts sales must necessarily lag behind increased automobile sales since used cars require more parts than new cars, was repeatedly emphasized to the jury and went to the weight, not admissibility, of the evidence.

Finally, the ten-year period used in the projection is justified by Anzelon's testimony that he and Combe had agreed that the franchise would continue at least that long. Judge Dooling properly instructed the jury that they must determine how long the franchise would have lasted in the absence of an unlawful termination.

■ Additional support for sustaining the verdict is derived from evidence elicited from defendant's witnesses. Peugeot argues that we should disregard this data since it was not a part of plaintiff's case. But our function here is to view the record as a whole, and "it is a novel concept that evidence is available only to the party who introduces it." Volkswagen Interamericana, S.A. v. Rohlsen, 360 F.2d 437, 445 (1st Cir.), cert. denied, 385 U.S. 919, 87 S.Ct. 230 (1966).

Henri Combe, executive vice-president of Peugeot, Inc. and president of Peugeot Western, the Peugeot subsidiary that replaced Autowest as distributor, testified that Volvo was similar to Peugeot. On the West Coast, Volvo sales increased from approximately 5,000–6,000 in 1965 to 10,000 in 1968, whereas Peugeot only increased from around 700 to 900 in this period. Despite Peugeot Western's experience of continual losses, Volvo's success, which is not surprising when considered in conjunction with rising sales of foreign cars in a fast-growing area of the country, rebuts Peugeot's contention that Autowest could not have been profitable.

Additionally, Peugeot sales did in fact increase on the West Coast between 1966 and 1968, and in 1967 virtually equalled Anzelon's estimate of 65 cars a month. Peugeot Western's actual cost experience in this period demonstrates that Farinelli's cost projections were, if anything, conservative, for they exceeded Peugeot Western's expenses. Again, Peugeot Western did sustain losses, and Peugeot contends that we should deem this actual experience of Autowest's successor conclusive. Peugeot, Inc.'s consolidated tax returns show, however, that Peugeot New England was enjoying profitable operations during this period, and no explanation is offered for the discrepancy. Thus, Peugeot New England's taxable income for 1968 was $65,730 on gross sales of $2,562,197, but Peugeot Western sustained a loss of $63,812 on gross sales of $2,184,486.

If this evidence—disinterested projections resting on reasonable and debatable assumptions, the actual sales experience of plaintiff's successor, the sales record of the comparable Volvo, and Peugeot New England's profitability—were held insufficient to support the jury's award of damages, few new franchisees would ever be able to recover future profits for wrongful termination. There should be no such insuperable barrier to recovery. While Autowest was an existing distributorship sustaining substantial losses, these losses were always contemplated; and when the Renault part of the business was sold, Autowest was essentially a new business venture.

## IV.

■ Peugeot contends that it was unfair to allow Leonard Fassler, the secretary, general counsel and 10% stockholder of Autowest, to represent plaintiff in this action. About one month prior to trial, Peugeot moved to disqualify the law firm of Buchner, Fassler & Oestreicher. Judge Dooling denied the motion. We hold that Judge Dooling did not abuse his discretion, and that subsequent occurrences at trial do not warrant reversal on this ground.

Peugeot's contention was that Fassler would necessarily be a witness. Actual-

ly, he never testified below, although defendant's counsel did read excerpts from his deposition. Peugeot also complains that Fassler "effectively" testified by leading witnesses through testimony as to what he had said. But perusal of the record discloses that to the maximum extent possible, he avoided using the first person pronoun. Indeed, Joseph Anzelon, plaintiff's principal witness, continually said "Mr. Fassler" rather than "you" in answer to Fassler's questions.

Peugeot's primary complaint, though, is that Fassler drew upon his personal recollection rather than the record in his summation to the jury. While we might reject this contention because no objection was raised at the time, United States v. Socony Vacuum Oil Co., 310 U.S. 150, 238–239, 60 S.Ct. 811, 84 L.Ed. 1129 (1940), we deem it preferable to assume that this case falls within the extraordinary circumstances exception and to reach the merits. Peugeot is in error. Fassler's summation scrupulously avoided venturing into personal recollection. The alleged instances when Fassler departed from the record—in telling the jury that he had given a Peugeot representative an explanation of his pro forma financial statement, that he had never seen Peugeot's Los Angeles attorney before February 8, 1966, that he met with this California lawyer and then informed Peugeot of the difficulty of permitting inspection of Autowest's books, and that Peugeot was advertised as one of the seven best cars in the world—are in fact supported by the record.

In so holding, we do not suggest that Fassler's acting as trial counsel did not present a problem. Indeed, if Judge Dooling had granted defendant's motion, his action clearly would not have been an abuse of discretion. Fassler negotiated the original 1964 Peugeot franchise, kept Combe informed of the Renault negotiations in December 1965–January 1966, told Combe that Autowest would adhere to Peugeot's "suggested dealer price," made and delivered the pro forma statement, refused to allow inspection of Autowest's books, and arranged financing for the Seattle shipment. In a very real sense, Fassler's "integrity, credibility and professional status were intertwined inseparably with the issues of the case upon which the jury was obliged to make a finding." Weil v. Weil, 227 App.Div. 378, 125 N.Y. S.2d 368 (1st Dept. 1953). On the other hand, we note that Alexis Coudert, Peugeot's attorney, was also secretary of Peugeot and participated in several negotiations.

The American Bar Association's Code of Professional Responsibility, effective January 1, 1970, provides:

> DR 5–101. Refusing Employment When the Interests of the Lawyer May Impair His Independent Professional Judgment.

> (B) A lawyer shall not accept employment in contemplated or pending litigation if he knows or it is obvious that he or a lawyer in his firm ought to be called as a witness, except that he may undertake the employment and he or a lawyer in his firm may testify:

> (1) If the testimony will relate solely to an uncontested matter.

> (2) If the testimony will relate solely to a matter of formality and there is no reason to believe that substantial evidence will be offered in opposition to the testimony.

> (3) If the testimony will relate solely to the nature and value of legal services rendered in the case by the lawyer or his firm to the client.

> (4) As to any matter, if refusal would work a substantial hardship on the client because of the distinctive value of the lawyer or his firm as counsel in the particular case.

Canon 5, Disciplinary Rule (DR) 5–101.[3] Perhaps most important in view of the

---

3. This rule supersedes former Canon 19, which provided:

> Appearance of Lawyer as Witness for His Client.

> When a lawyer is a witness for his client, except as to merely formal matters, such as the attestation or custody of an instrument and the like, he should

posture of this case, "doubts should be resolved in favor of the lawyer testifying and against his becoming or continuing as an advocate." Canon 5, Ethical Consideration (EC) 5–10.

Defendant's final contention is that evidence of complaints by one or two dealers was erroneously refused. This is a trivial matter in a long trial. Assuming, without deciding, that there was error, it could not have been prejudicial, especially since the substance of these dealers' complaints ultimately was included in the record through testimony and exhibits.

Affirmed.

leave the trial of the case to other counsel. Except when essential to the ends of justice, a lawyer should avoid testifying in court in behalf of his client.