506 So.2d 317 (1987)
SUPER VALU STORES, INC.
v.
Thomas J. PETERSON.
85-484.
Supreme Court of Alabama.
March 27, 1987.
*319 James A. Harris, Jr., Thomas H. Brown, Charles R. Driggars, and Kay K. Houser, of Sirote, Permutt, Friend, Friedman, Held & Apolinsky, Birmingham, and Patrick W. Richardson and Schuyler H. Richardson III, of Bell, Richardson, Herrington, Sparkman & Shepard, Huntsville, and James C. *320 Stivender, of Inzer, Suttle, Swann & Stivender, Gadsden, for appellant.
Andrew W. Bolt II, W. Kirk Davenport, and Paula Ivey Cobia, of Bolt, Isom, Jackson & Bailey, Anniston, and Gregory S. Cusimano, Larry Keener, and Michael L. Roberts, of Floyd, Keener & Cusimano, Gadsden, and Fournier J. Gale III, Kirby Sevier, Lee E. Bains, Jr., and Maibeth J. Porter, of Maynard, Cooper, Frierson & Gale, Birmingham, for appellee.
MADDOX, Justice.
Hardin and Co., Warehouse Markets, Inc., Mary-Beth, Inc., Mary Hardin, Mary Lee Hardin, and Nettie Elizabeth Hardin (all these parties shall be referred to as "Hardin") commenced this action in March 1984 by filing a complaint against Super Valu Stores, Inc. ("Super Valu" or "Appellant") and Peterson ("cross-claimant" or "appellee"). Hardin claimed that Peterson, acting on behalf of Super Valu, had promised it the right to operate a certain type of grocery store (known as a "County Market") to be built at a particular location in Oxford, Alabama, and that Super Valu and Peterson had acted to deprive Hardin of this right. Hardin sought damages and injunctive relief to prevent the store from being constructed and from being operated by anyone else. The plaintiffs' claim in that lawsuit was settled and both Super Valu and Peterson were fully released from all potential liability to Hardin.
In that action Peterson filed a cross-claim against Super Valu in November 1984. That cross-claim arose out of an alleged willful failure by Super Valu to construct and lease to Peterson a discount grocery store, known as the Oxford County Market. Briefly stated, Peterson's substantive claims at trial were twofold: (1) that Super Valu's deliberate decision not to build this store as previously agreed constituted a material breach of an express contract, destroying Peterson's career plans and causing him to lose millions of dollars, and (2) that certain misrepresentations and nondisclosures by Super Valu resulted in enormous damages to him. On August 7, 1985, the jury returned a verdict against Super Valu and in favor of Peterson in the amount of $5,000,000 and a judgment was entered on the same date.
The facts pertinent to this action follow: Super Valu purchased a parcel of property in Oxford, Alabama, in 1981, and eventually made plans for its development as a "County Market." The County Market concept was a new one; the first County Market opened in 1981. The basic concept of the County Market is that it must be the lowest priced store in the market and operate on a high volume, low profit structure; thus, it must draw customers from a larger market area than a traditional supermarket. Since Super Valu was a wholesaler, it planned to have an independent retailer operate the County Market planned for Oxford. Peterson (who at this time was president of the Anniston Division of Super Valu) presented several potential operators, including Hardin, to Super Valu for consideration. Hardin was initially rejected by Super Valu as a retailer for the proposed Oxford County Market. Subsequently, Hardin was approved, conditioned upon acceptable financing being arranged, without credit assistance from Super Valu. Hardin thereafter failed to secure the required financing.
At least three other prospective retailers other than Peterson considered operating the Oxford County Market; however, none of these men decided to undertake the project. At this point (May 1983), Peterson decided to become a formal applicant for the retailer's position at the proposed County Market. In January 1984, Peterson was approved as the retailer of the proposed Oxford County Market. This approval required Peterson to retire from his job at Super Valu, because Super Valu policy would not allow an employee to own an interest in a retail grocery store.
In January 1984, a representative of Super Valu told Hardin that Peterson, not Hardin, would be the retailer of the proposed store. On February 14, 1984, Peterson received a letter from Hardin's attorney threatening suit because Hardin was not going to be the operator of the proposed store. In the meantime, progress *321 continued for the development of the store with Peterson as the retailer. Peterson retired from Super Valu on February 29, 1984. In March 1984, Super Valu's attorney spoke to Peterson and asked him to hold off on going forward with the store until the Hardin situation could be resolved. Peterson agreed to do so. On April 3, 1984, Peterson was served with a complaint filed by Hardin against Super Valu and Peterson.
Shortly after the filing of the Hardin lawsuit, Peterson, through his attorney, made demands upon Super Valu to continue with the building of the proposed County Market. He later withdrew the demands that the development of the store proceed. On November 19, 1984, Peterson filed a cross-claim against Super Valu, alleging that Super Valu had entered into a binding contract with him whereby he would become the retailer of the proposed County Market in Oxford.
Super Valu raises twelve issues on appeal.

I
The first issue raised is whether the trial court erred to reversal in excluding from evidence all communications between the parties after April 3, 1984, the date Peterson was served with the Hardin complaint.
The trial court ruled that all communications between Peterson and Super Valu after April 3, 1984, were inadmissible because the court considered them to be offers of compromise of the preceding litigation against Super Valu and Peterson. Super Valu argues that this ruling deprived it of the opportunity to prove to the jury that: (a) Peterson and his attorneys agreed to the delay in proceeding to build the store until the Hardin claim for injunctive relief, and possibly specific performance, could be resolved; (b) Super Valu, on several occasions, after April 3, 1984, offered to perform its obligations under the contract; and (c) Peterson refused to go forward with the obligations under the contract. Super Valu contends that two letters that were excluded were clearly not offers of compromise; rather, that the letters confirmed an alleged modification of the alleged contract. Super Valu also argues that many of the communications excluded from evidence by the trial court's ruling were offers of performance, not offers of compromise, and should not have been excluded.
The Alabama law regarding the admissibility of settlement communications between parties is well established. The general rule is that offers of compromise by one party to another in a civil action, whether before or after the litigation is begun, is inadmissible. Glaze v. Glaze, 477 So.2d 435 (Ala.Civ.App.1985). Alabama courts also recognize that conversations in connection with settlement negotiations are inadmissible. Chandler v. Owens, 235 Ala. 356, 179 So. 256 (1938). Negotiations looking to a compromise of controversies are privileged and inadmissible. See, Ford v. Bradford, 212 Ala. 515, 103 So. 549 (1925). Likewise, offers to perform that are conditional amount to mere efforts to settle a pending claim and are thus inadmissible. Yeager v. Hurt, 433 So.2d 1176 (Ala.1983).
After numerous telephone conversations with Super Valu representatives, Peterson's attorney, A.W. Bolt, wrote a letter to Patrick Cashin, in-house counsel for Super Valu, on April 13, 1984. This letter stated, in pertinent part:
"Tom has thought long and hard about the alternatives that are available. Since he has done nothing wrong and he retired in order to remain in this area and own and operate the County Market store in Oxford, he is not going to allow someone to intimidate him out of what is rightfully his. Tom feels that he did everything he could to assist Mary Hardin in her business and to obtain the Oxford store for her; she simply did not cooperate and was not able to meet the financial and management criteria of the home office.
"Tom wants the Oxford store, and he wants it now since further delay permits the competition to get into the market and further undermines his ability to get the store profitable quickly. Furthermore, Tom requests your written agreement *322 to indemnify and hold him harmless for the allegations of the complaint, and to pay the expenses of his defense."
The three demands raised in this initial letter(a) completion of the Oxford store, (b) an agreement to indemnify, and (c) payment of expenses of defensewould continue to permeate all future negotiations and discussions between the parties. The trial court refused to permit this letter to be introduced into evidence.
In the midst of trial, Super Valu also sought to introduce the testimony of Peterson, Cashin, Gene Hoffman (Peterson's immediate supervisor), and Mike Wright regarding certain conversations occurring after April 3, 1984. Super Valu also sought to introduce selected letters between the parties written after that date. The trial court heard argument by counsel, examined the documents in camera and heard testimony, outside the presence of the jury, and reviewed a number of letters during an overnight recess. After reviewing the evidence, the court granted Peterson's motion in limine and refused to admit evidence offered by Super Valu of selected communications between the parties or their attorneys after the service of the Hardin complaint. The court concluded that all proffered communications were in the nature of settlement negotiations.
Super Valu heavily concentrates its argument on the two letters dated April 13, 1984,[1] and May 18, 1984,[2] from Peterson's counsel to Super Valu. Super Valu contends strenuously that these letters contained "absolutely no offers of compromise." When one reads the letters in context, however, it is immediately evident that they were integral parts of the parties' settlement efforts.
At the time these letters were written, settlement negotiations were actively underway in connection with the ongoing dispute about Super Valu's obligation to "take care of Peterson in the Hardin lawsuit, which included building the store for him in accordance with the contract. Bolt's letter of April 13 unequivocally demanded that Super Valu commence work on the County Market, indemnify Peterson in the Hardin suit, and pay his attorney fees. Davenport's letter confirming Bolt's telephone conversation on May 18 with Cashin merely withdrew Peterson's demand that Super Valu immediately honor its obligation to build the store. The letter specifically noted that the withdrawal was without prejudice to Peterson's right "to force Super Valu to expeditiously proceed forward with the store plans at some point in the future." The letter did not withdraw Peterson's demand for indemnity and attorney fees. This is underscored by Cashin's May 22 letter to Bolt, confirming the same May 18 telephone conversation in which Cashin noted that "perhaps resolution of our differences covering the site and defense expenses for Tom Peterson can be worked out in the future."
Super Valu's contention that the parties had no actual dispute on April 13, 1984, about Super Valu's obligation to build the store, we believe, is not supported by the facts. The April 13 letter from Bolt to Cashin demanded that the store be built on the Oxford site, indemnification, and a defense. *323 These three issues remained in dispute before and after the filing of Peterson's cross-claim. Cashin testified that prior to the April 13 letter, he and Bolt had already engaged in several telephone conversations. If Peterson had, in fact, "agreed" on March 29 to a delay in construction of the Oxford site and there was no dispute, there would have been no reason for his attorney to demand that the store be completed as outlined in the April 13 letter. The evidence was sufficient for the trial court to find that at least by March 28, 1984, the present dispute existed which prompted the demand. Consequently, we find that the April 13 letter, which was written in an attempt to resolve the controversy, was properly excluded from evidence by the trial court.
Considering the May 18, 1984, letter in conjunction with the prior and subsequent settlement discussions of the parties, as well as the Cashin letter of May 22, we believe the trial court did not err in its holding that it, too, was inadmissible. The court could have found that the May 18 correspondence "confirmed" a telephone conversation between the parties on that date, and that prior to that time, both parties had exchanged unaccepted settlement proposals. As was stated in the May 18 letter: "Our previous offer of compromise to you on Monday, May 14, is now withdrawn and no offers are presently outstanding." Although this particular offer was withdrawn, there was no indication that the settlement process had ended; Cashin's letter of May 22 expressed hope that the parties could settle their differences regarding the store and Peterson's attorney fees at a later date. Bolt's letter to Cashin of June 18, and Cashin's reply of June 26, clearly reflected the parties' continued efforts to reach an accord.
The trial court could have concluded that the letter of May 18 was one link in the chain of negotiations between the parties, and involved compromise considerations, even though it was a withdrawal of an earlier compromise proposal, and that the withdrawal of the demand to immediately proceed with development of the Oxford site was not an admission of any fact in light of the previous settlement negotiations and Peterson's position that he had an enforceable contract with Super Valu. This position is further strengthened by the ample evidence from which the jury found that Peterson had not agreed to delay the store's development. We are of the opinion that the trial court's exclusion of the April 13 and May 18 letters from evidence on the ground that they were integral parts of the parties' settlement negotiations was manifestly correct.
A complete review of the parties' communications after the filing of the Hardin suit underscores the correctness of the trial court's decision to exclude such evidence as settlement negotiations. Super Valu never made an unconditional offer to build the County Market. Any offer to build the store was intertwined with the unresolved issues of indemnity against liability and payment of Peterson's defense costs in the Hardin suit. Even the October 26, 1984, letter of Cashin to Bolt, which Super Valu highlights as its "unconditional" offer, contained the following language:
"We also believe the issues relating to Tom's indemnification and defense cost should be resolved between us concurrently with the above definitive agreements.... Any indemnification agreement which may be agreed upon between us is subject to subsequent approval by Super Valu's Board of Directors."
In addition to the approval of Super Valu's board of directors, the letter further conditioned the offer on the negotiation and preparation of at least six "definitive agreements." The letter also rejected as "unacceptable and nonnegotiable" the contents of the "Items for Discussion" list, which contained numerous issues to be addressed by the parties in their ongoing settlement negotiations.
As we have previously stated, this Court's case of Yeager v. Hurt, supra, clearly stands for the proposition that conditional offers of compromise are inadmissible. A review of the pertinent facts in the instant case reveals that the trial court *324 did not err to reversal by excluding this evidence.
We reach this result, because we find that the trial court was authorized to conclude that the letters from Peterson's counsel to Super Valu eliminated all doubt that the three issuesa defense in the Hardin suit, indemnification, and the Oxford site were inseparable for purposes of settlement. Bolt's letter of April 13, 1984, initially set forth these three issues as problems for resolution. These three requirements were reiterated in his proposal of May 3, 1984. This letter called for Super Valu to provide Peterson with defense counsel of his own choice and conditioned any decision regarding the store on an acceptable indemnity agreement.
Bolt's letter of June 26, 1984, further revealed the related nature of the three issues:
"Tom is prepared to defer any further discussions of consideration of the Oxford store pending the reaction of your Board [of Directors] to his request [for indemnification and defense] and the taking of the depositions of Mrs. Hardin and Mike Sanders."
Bolt's letter to Cashin approximately three months later, on September 12, 1984, after the parties had exchanged six more letters, again highlighted the dispute:
"17. Since ... [the Hardin] lawsuit was filed, Tom Peterson has asked for three items: a. Indemnification; b. Defense; and c. Either the completion of the Oxford store or an acceptable alternative....
"* * *
"20. Soon thereafter, [after the Board of Directors meeting in late June 1984] Tom was told that contrary to the prior representations, the matter of indemnification could be handled without approval of the Board of Directors. At this point the representation was made to Tom that if he would accept an alternative site for his store, and give up his claim entirely to the Oxford store, that arrangements would be made to discuss with him the subjects of indemnification and a defense."
The rationale and public policy underlying the privileged nature of settlement negotiations is the encouragement of extrajudicial settlement of disputes. Indemnity Co. of America v. Pugh, 222 Ala. 251, 132 So. 165 (1931). A reversal of the trial court's exclusion of Super Valu's proffered evidence would tend to defeat this policy and make the settlement of disputes less likely.

II
Second, Super Valu contends that in closing arguments Peterson's counsel exploited the lack of evidence to argue false inferences from the evidence that was allowed. Super Valu contends that the jury was left with the erroneous impression that the only reason the store was never built was because Super Valu refused to build it, without having the benefit of the evidence regarding Peterson's refusal to go forward with the project. The argument which Super Valu contends was improper is as follows:
"Mr. Bolt: I know everyone of you have done what I have, at times you've called up some business, some large company and asked a question and been put on hold ... and Tom Peterson has been on hold for sixteen months. Sixteen months he has been on hold. And I will have to say that I have been involved in this thing sixteen months and there are some things about it that have been welling up inside of me, and I feel them and I am going to try to share some of them with you.
"Mr. Patrick Richardson: If the Court, please, we object to matters pertaining to developments after April 3, 1984. I believe the Court has ordered such matters are not
"The Court: That was ruled on in motion in limine, I believe." (Emphasis added.)
Later, counsel for Peterson continued this line of argument:
"Mr. Cusimano: ... So what did they do? They stopped Tom's store and without Tom being there, the first opportunity *325 ... now, why didn't they build Oxford County Market then?

"Mr. Patrick Richardson: Object, if the Court please.
"Mr. Cusimano: All right. I would suggest to you that had the County Market been built and been operated they could not have come into Court and said poo-poo on these projections because you would have been looking at actual dollars.

"Mr. Dick Richardson: Your Honor, this is improper
"Mr. Cusimano: They had a lawsuit from Tom
"Mr. Dick Richardson: Mr. Cusimano has been keeping us from going into this by
"Mr. Cusimano: Your Honor, I'm arguing
"The Court: Argue just from the evidence.
"Mr. Cusimano: Yes sir. They had a lawsuit from Tom Peterson on lost profits. If they had built that store with another retailer or had they elected to build that store instead of Anniston High School you would have been looking at real dollar profits for a year or two up there. You could not have said these surveys are no good. So they couldn't do that, could they?

"Mr. Patrick Richardson: If the Court please, we object to argument of matters occurring after the effective date the Court
"Mr. Cusimano: I am not arguing on anything that is after other than inference." (Emphasis added.)
Closing arguments may encompass two separate and distinct areas. First, argument may rest upon facts in evidence. Second, arguments may extend to inferences arising from those facts in evidence. Seaboard Coast Line R.R. v. Moore, 479 So.2d 1131 (Ala.1985). Whether the closing argument exceeds these limits is determined by the trial court in its discretion. Because of the nature of closing arguments, "much must be left to the enlightened judgment of the trial court, with presumptions in favor of its rulings." Adams v. State, 291 Ala. 224, 228, 279 So.2d 788 (1973). "Substantial injury" must occur before a trial court's rulings will be reversed. Costarides v. Miller, 374 So.2d 1335, 1337 (Ala.1979).
We find no abuse of the discretion given the trial judge. Peterson's closing argument appears to be based on the facts in evidence, and inferences therefrom.
Super Valu attacks principally two isolated remarks. First, Bolt argued that "Peterson has been on hold for sixteen months." Second, Cusimano responded to Super Valu's attack on the accuracy of Peterson's evidence relating to profit projections by arguing that actual figures would have been available if Super Valu had built the store. We see nothing improper about these, because they relate to matters based upon Peterson's claim that Super Valu failed to build the Oxford County Market. We find no reversible error here.

III
The third issue presented is whether the trial court erred when it overruled Super Valu's motion for a new trial, and its motion for judgment notwithstanding the verdict (JNOV) directed to Peterson's contract claim on the ground that there was insufficient evidence of a breach of the alleged contract by Super Valu. Super Valu also argues that an agreement by both parties to a contract to delay performance does not constitute a breach of that contract by either of the parties. Super Valu contends that because the undisputed evidence heard by the jury was that both parties agreed to halt development of the store there was no evidence of a breach by Super Valu.
Super Valu's contention that both parties agreed to halt the construction of the store is based on Cashin's testimony, which the jury may have accorded little credibility. The jury could have concluded from Peterson's testimony, on the other hand, that he never agreed to anything with Cashin concerning halting the construction of the store. In other words, the jury could have concluded that in his March 29 telephone *326 conversation with Peterson, Cashin presented the halting of the store as having already been accomplished. In short, the jury could have concluded from the evidence that Super Valu had unilaterally stopped Peterson's store before telling him. There is some testimony in the record that would support Super Valu's contention as to what occurred, but there is also testimony that Peterson believed that any delay in the store would be brief. There is some testimony regarding the actions he took immediately before and after his telephone conversation with Cashin. For example, Peterson testified that he had already been informed of Super Valu's halting of the store on March 28, and that he had immediately called his former boss and complained about it. There is also evidence that on the day after Cashin's telephone call, March 30, Peterson interviewed a prospective County Market employee and contacted his attorney, Bolt, for the first time. The jury could have concluded, based upon this action by Peterson, that he did not mutually agree to halt the project.
The standard of review with regard to a motion for a new trial is set forth in City of Tallassee v. Harris, 431 So.2d 1177, 1181 (Ala.1983), quoting Jacks v. City of Birmingham, 268 Ala. 138, 142-43, 105 So.2d 121, 125-26 (1958), as follows:
"`Verdicts are presumed to be correct and no ground of a motion for new trial is more carefully scrutinized or more rigidly limited than that the verdict is against the evidence. And it has been recognized by this court that when the presiding judge refuses, as here, to grant a new trial, the presumption in favor of the correctness of the verdict is strengthened. Smith v. Smith, 254 Ala. 404, 48 So.2d 546; Mintz v. Millican, 206 Ala. 479, 97 So.2d 769.'"
We are of the opinion that there was sufficient evidence before the jury for the jury to find that Super Valu breached its contract with Peterson. There was evidence from which the jury could have found that Super Valu unilaterally stopped Peterson's store before telling him. Peterson testified that he thought any delay would only be for "several days." It is also clear from the evidence that there was no mutual assent, definiteness, or certainty in the understanding of Peterson and Super Valu as a result of the telephone conversation between Peterson and Cashin regarding the halting of the store. Thus, the trial court correctly denied Super Valu's motion for a new trial regarding the contract claim.

IV
The fourth issue presented is whether Peterson presented competent evidence proving with "reasonable certainty" the lost profits that he suffered as a result of Super Valu's conduct.
Super Valu contends that the trial court erroneously allowed "expert" testimony, and other evidence to the effect that the hypothetical County Market would have earned profits of $20,000,000 in fifteen years of operation by Peterson. Super Valu argues that this Court follows the general rule of damages that anticipated profits of a commercial business are too speculative, remote, and uncertain to permit their recovery. Super Valu argues that the "per se" rule of lost profits should apply to this case. The "per se" rule of lost profits is that anticipated profits of a new or hypothetical business can never be recovered, because they are inherently too speculative and conjectural.
Super Valu also contends that there are no Alabama cases that have allowed a plaintiff to recover anticipated profits of a hypothetical business that never operates. Super Valu contends that proof of lost profits must satisfy the "reasonable certainty" test. Super Valu argues that under this test a plaintiff must prove a subsequent profit history and that any uncertainty that plaintiff would in fact have made a profit is fatal to the lost profits recovery. Super Valu also argues that the plaintiff must also establish that he has a profitable, substantially similar business in the same geographic area. Finally, Super Valu contends that Peterson's profit projections constitute remote, speculative, and conjectural evidence.
*327 We are of the opinion that the jury's award of compensatory damages to Peterson is completely consistent with the law of Alabama and with the evidence in this case. Current Alabama law, like the law of other states, authorizes recovery of anticipated profits of an unestablished business, if proved with reasonable certainty. See, Morgan v. South Central Bell Telephone Co., 466 So.2d 107 (Ala.1985). In this case, Peterson's evidence of lost profits is sufficient to meet the "reasonable certainty" standard and supports the jury award.
This Court confirmed that the reasonable certainty standard for proving profits of an unestablished business prevails in Alabama in Morgan v. South Central Bell Telephone Co., 466 So.2d 107 (Ala.1985). In Morgan, as in the present case, plaintiffs sued on theories of fraud and breach of contract, seeking to recover for damages to their business. Plaintiffs presented evidence as to the profits they would have earned but for the defendants' actions. In ruling that "there was sufficient evidence to support the jury's award of compensatory damages for lost profits," this Court explained the operation of the reasonable certainty rule for recovery of lost profits:
"The rule in Alabama concerning proof of lost profits was set forth in Paris v. Buckner Feed Mill, Inc., 279 Ala. 148, 149, 182 So.2d 880, 881 (1966), by Justice Simpson:
"`... In order that it may be a recoverable element of damages, the loss of profits must be the natural and proximate, or direct, result of the breach complained of and they must also be capable of ascertainment with reasonable, or sufficient, certainty, or there must be some basis on which a reasonable estimate of the amount of the profit can be made; absolute certainty is not called for or required.' (Emphasis added [in Morgan].)
"This general rule is applied in most states, and is referred to as the rule of `reasonable certainty.' The United States Supreme Court, in Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544 (1931), stated that this rule precludes only those damages not resulting from the wrong, allowing damages stemming from the wrong but uncertain in amount."
Morgan v. South Central Bell, at 115-16.
This Court's explicit rationale for applying the reasonable certainty rule was its recognition that to disallow damages for loss of reasonably certain future profits "would encourage breach of contract with new businesses." 466 So.2d at 116.
The holding in Morgan is that Alabama jury verdicts awarding lost profits will be affirmed if the plaintiff provides a "basis upon which the jury could, with reasonable certainty, calculate the amount of profits which were lost as a result of" defendant's wrongful actions. Morgan, at 116 (emphasis original). This principle is completely consistent with two earlier Alabama cases that affirmed jury awards of lost anticipated income involving unestablished business relationships.
In American Life Ins. Co. v. Shell, 265 Ala. 306, 90 So.2d 719 (1956), this Court permitted the recovery of anticipated lost income by a new business. There, 16 days after plaintiff had entered into a business relationship with one Forsyth, Forsyth terminated the relationship because of actions taken by the defendant. Plaintiff sued the defendant, seeking to recover the income he had hoped to earn from his contract with Forsyth. There is no mention of evidence concerning any income that plaintiff may have earned while his business relationship existed with Forsyth. Instead, the trial testimony focused on the income that Forsyth generated during the six months after the end of his business relationship with plaintiff. Although the business relationship between plaintiff and Forsyth was essentially unestablished and the damages testimony dealt with matters that did not occur during the time of the relationship, this Court affirmed plaintiff's jury award based on lost anticipated income:
"[T]he proof was admissible to give the jury a basis upon which the amount of plaintiff's loss could be estimated. If the *328 testimony of the plaintiff was believed by the jury, the jury had the right to find that the defendants by their wrongful act destroyed the plaintiff's life insurance agency and having done this cannot then claim that the plaintiff cannot recover what he lost under the contract just because the very act of destruction by the defendants made it difficult for the plaintiff to prove what he would have made of the agency. It is true that damages may not be determined by mere speculation or conjecture, but evidence tending to show the extent of the damages as a matter of just and reasonable inference, should be admissible where the fact of damage has been proved."
265 Ala. at 311, 980 So.2d at 722. In reaching its decision, the Court quoted the United States Supreme Court decision in Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544 (1931), as establishing the rule of damages that will control whenever a defendant's wrongful act has made it difficult for the plaintiff to show with "reasonable certainty" the amount of his loss:
"`[I]t will be enough if the evidence show the extent of the damages as a matter of just and reasonable inference, although the result be only approximate. The wrongdoer is not entitled to complain that they cannot be measured with the exactness and precision that would be possible if the case, which he alone is responsible for making, were otherwise.... [T]he risk of the uncertainty should be thrown upon the wrongdoer instead of upon the injured party....
"`* * *
"`Juries are allowed to act upon probable and inferential, as well as direct and positive proof. And when, from the nature of the case, the amount of the damages cannot be estimated with certainty, or only a part of them can be so estimated, we can see no objection to placing before the jury all the facts and circumstances of the case, having any tendency to show damages, or their probable amount; so as to enable them to make the most intelligible and probable estimate which the nature of the case will permit.
"`* * *
"`To deny the injured party the right to recover any actual damages in such cases, because they are of a nature which cannot be thus certainly measured, would be to enable parties to profit by, and speculate upon, their own wrongs, encourage violence and invite depredation. Such is not, and cannot be the law....
"`Damages include those which [c]annot be ascertained by a fixed rule, but must be matter of opinion and probable estimate. And the adoption of any arbitrary rule in such a case, which will relieve the wrongdoer from any part of the damages, and throw the loss upon the injured party, would be little less than legalized robbery.
"`Whatever of uncertainty there may be in this mode of estimating damages, is an uncertainty caused by the defendant's own wrongful act; and justice and sound public policy alike require that he should bear the risk of the uncertainty thus produced.... "The constant tendency of the courts is to find some way in which damages can be awarded where a wrong has been done."'"
265 Ala. at 311-12, 90 So.2d at 723-24 (emphasis added in Shell.)
The Court of Appeals affirmed a verdict awarding lost anticipated income from a business relationship that was never established. Western Union Tel. Co. v. Tatum, 35 Ala.App. 478, 49 So.2d 673, cert. denied, 255 Ala. 13, 49 So.2d 678 (1950). In Tatum, a shipping company sent a telegram to plaintiff, offering him a position as master of a ship and requesting an immediate response. The defendant, Western Union, was tardy in delivering the telegram so that when plaintiff was finally able to make contact with the shipping company, he learned that the position had been filled. Plaintiff sued Western Union, seeking to recover the anticipated lost income from his unestablished business relationship with the shipping company. The evidence established both the salary that plaintiff *329 would have earned from his unestablished business relationship and the terminable-at-will nature of plaintiff's anticipated employment. In rejecting Western Union's argument that the damages flowing from plaintiff's unestablished business relationship were too speculative, the court stated:
"Recovery should not be denied merely because such damages are difficult of ascertainment."
35 Ala.App. at 481, 49 So.2d at 675. The Court also stated:
"We think that the jury in the present case, relying on their `good sense,' could reasonably infer a reasonable probability of [plaintiff's] employment, and that such chance of employment had a reasonably substantial value, even though had [plaintiff] obtained the appointment as master the company would have had the right to discharge him at will."
35 Ala.App. at 482, 49 So.2d at 676.
A leading commentator on the issue of lost profits expressly recognized in 1981 that the "trend of the modern cases is plainly toward" adopting the "reasonable certainty" standard in awarding lost profits for unestablished businesses. R. Dunn, Recovery of Damages for Lost Profits 2d 188, 196 (1981). A review of the relevant case law, both shortly before and in the six years since that statement was written, seems to confirm it.
For a review of the Alabama law regarding lost profits in new or unestablished businesses, see, Comments, The Evolution of the New Business Rule, 17 Cum.L.Rev. 239 (1986-87); Roberts, Profit Recovery for the New or Unestablished Business, 48 Ala.Law. 78 (1987).
In Lee v. Seagram & Sons, Inc., 552 F.2d 447, 455 (2d Cir.1977), the court affirmed a verdict for lost profits that would have been earned from a liquor distributorship that defendant had agreed to provide plaintiff. Although the business was completely unestablished, the court held that profits had been established with reasonable certainty through expert testimony projecting profits over ten years, which was the "assumed" life of this type of business. The court rejected defense arguments that this proof was speculative:
"Mere dispute on the validity of some of the figures cannot wipe out the evidence but merely emphasizes that the jury was presented with a factual question whose determination we should not change."
Lee v. Seagram & Sons, Inc., at 456.
In Chung v. Kaonohi Center Co., 62 Hawaii 594, 618 P.2d 283 (1980), the court affirmed a lost profits recovery for a restaurant that never commenced operations because of defendants' breach of an agreement to lease mall space. Plaintiff's expert testimony involved a one-day "survey" of a comparable business's sales, industry averages, and projections of profits over the ten-year lease. In holding that the plaintiff satisfied the "reasonable certainty" standard for proving lost profits for its unestablished business, the court explained:
"[I]t would be grossly unfair to deny a plaintiff meaningful recovery for lack of a sufficient `track record' where the plaintiff has been prevented from establishing such a record by defendant's actions. Thus, we hold that where a plaintiff can show future profits in a new or unestablished business with reasonable certainty damages for loss of such profits may be awarded."
62 Hawaii at 605, 618 P.2d at 291.
In Welch v. United States Bancorp Realty & Mortgage Trust Co., 286 Or. 673, 596 P.2d 947 (1979), the court allowed a recovery for lost profits by an unestablished business:
"Loss of profits will not be denied even though plaintiff does not rely on a past history of profitable operations if they are established by other factual data to a reasonable certainty."
286 Or. at 704, 569 P.2d at 963 (citations omitted). The court noted that expert testimony regarding plaintiff's anticipated return in future years from a complex real estate development venture was all that could be expected in the circumstances of this case. 286 Or. at 705, 596 P.2d at 964. To require more "would be tantamount to holding that the defendant could breach *330 this particular contract with impunity." 286 Or. at 705, 596 P.2d at 964.
In Fera v. Village Plaza, Inc., 396 Mich. 639, 242 N.W.2d 372, 376 (1976), the court affirmed a lost profits verdict for an unestablished store because the anticipated profits were proven with reasonable certainty. The court observed that the verdict amount was well within the ranges of proofplaintiff's proof of profits based on its expert's ten-year projections as opposed to defendant's proof of no profits.
As these cases demonstrate, the weight of modern authority does not predicate recovery of lost profits upon the artificial categorization of a business as "unestablished," "existing," or "new," particularly where the defendant itself has wrongfully prevented the business from coming into existence and generating a track record of profits. Instead, the courts focus on whether the plaintiff has adduced evidence that provides a basis from which the jury could with "reasonable certainty" calculate the amount of lost profits. As held in Fera and Chung, the risk of uncertainty must fall on the defendant whose wrongful conduct caused the damages.
The fundamental basis for Peterson's evidence as to damages was Super Valu's own projections of profits, produced in its normal course of business long before this dispute arose. These projections were the product of an intense, exhaustive process involving many different Super Valu personnel. Super Valu's projections resulted from the application of a scientific methodology that for many years had accurately predicted the future performance of stores associated with Super Valu. These projections were also based upon the prior successful performance of the Super Valu business system, of which the Oxford County Market would have become a standardized part. The jury could have found that Super Valu and Peterson relied upon these profit projections in making their initial decision to go forward with the Oxford County Market store. Super Valu's three-year profit projections were analyzed and extended by Peterson's expert market analyst, Roger Walker. Peterson's expert used Super Valu's figures as a base in order to make further profit projections for the 12 subsequent years of the 15-year lease that Super Valu had allegedly agreed to grant Peterson. This evidence was sufficient, in our judgment, to satisfy the "reasonable certainty" standard established in Alabama law for satisfactory proof of lost profits.
In considering claims by unestablished or new businesses for lost profits, courts have consistently given special deference to a party's pre-dispute projections of anticipated profits. As one court succinctly noted, pre-dispute projections are "no mere `interested guess' prepared with an eye on litigation. Instead, they [are] ... the product of deliberation by experienced businessmen charting their future course." Autowest, Inc. v. Peugeot, Inc., 434 F.2d 556, 566 (2d Cir.1970) (affirming profits award for new business).
The courts have shown even more deference in a situation, such as exists in the present action, where plaintiff's proof of lost profits is based on pre-dispute projections prepared by the defendant. For example, in a closely analogous case, a substantial verdict for lost profits was upheld where plaintiff's proof was based upon the defendant's "projected profit-and-loss statement" for plaintiff's anticipated second year of operation as one of defendant's distributors. Computer Systems Eng'g, Inc. v. Qantel Corp., 740 F.2d 59, 66 (1st Cir.1984). Similarly, lost profits have been awarded based on sales "projections, prepared by the defendant's market expert, [that] were not put together with an eye to litigation." Perma Research & Dev. Co. v. Singer Co., 402 F.Supp. 881, 898-902 (S.D. N.Y.1975), aff'd, 542 F.2d 111 (2d Cir.1976), cert. denied, 429 U.S. 987, 97 S.Ct. 507, 50 L.Ed.2d 598 (1976).
The courts have permitted pre-dispute projections to be extrapolated into future years in order to determine the full measure of lost profits. In Computer Systems Eng'g, Inc. v. Qantel Corp., plaintiff's expert took defendant's profit projections for plaintiff's anticipated second year of operation as one of defendant's distributors and *331 "extrapolated [plaintiff's] projected profits over the five-year term of the extended contract." 740 F.2d at 66. The defendant raised many of the same objections raised by Super-Valu in this case; objections to the methodology used by plaintiff's expert in deriving his lost profit projections and an objection that the plaintiff's proof of lost profits was too speculative to support an award because plaintiff had no previous earnings history as a distributor for the defendant. In rejecting the defendant's arguments, the court explained that the defendant's objections would have been better aired through cross-examination of plaintiff's expert or through testimony by an expert for the defendant. In Perma Research & Dev. Co. v. Singer Co., 402 F.Supp. at 901, the court held that it was "eminently rational" to project that the sales figures that the defendant expected to attain after the first two years would at least have been maintained for the second five years of the ten-year contract. See also Lee Shops, Inc. v. Schatten-Cypress Co., 350 F.2d 12, 16 (6th Cir.1965), cert. denied, 382 U.S. 980, 86 S.Ct. 552, 15 L.Ed.2d 470 (1966) (pre-dispute profit projections for proposed discount department store extrapolated by expert over the 15-year term of the lease).
These cases provide strong support for the upholding of the jury verdict for Peterson. Here, Super Valu developed projections as to the anticipated profits that Peterson would earn from the Oxford County Market. As in the Autowest v. Peugeot case, these pre-dispute projections were "no mere `interested guess' prepared with an eye on litigation. Instead, they were the product of deliberation by experienced businessmen charting their future course." 434 F.2d at 566. Using a methodology embraced by the courts, Peterson's expert used Super Valu's own calculations and extrapolated those projections into future years in order to determine the full measure of lost profits.
Introduced into evidence was Super Valu's description of the proven accuracy of its sales projections, as follows:
"The SLASH team of Super Valu market analysts, computer programs and data bases has successfully demonstrated the superior accuracy of this computerized site concept since 1968.... [Super Valu's team] produces an extremely accurate site evaluation report. This team service takes the uncertainty out of expansion, accurately forecasts sales for new or existing supermarkets, [tells] the most profitable store size, estimates the dollar sales that will transfer from existing sister stores, identifies current market position for all supermarkets in an area ... [and] predicts sales changes for long term.... SLASH techniques make it possible for Super Valu market analysts to make accurate forecasts for any site, for any type of supermarket, in any part of the country."
The jury could have found that Super Valu's comments concerning the accuracy of its projections were well-founded in fact, because there was evidence that Super Valu conducted follow-up reports comparing actual performance to the sales projections. Total actual sales as a percentage of projected sales for the category of "stores in new buildings" ranged from 92.1% to 125.6%.
Applying its proven research and analytical techniques to the proposed Oxford County Market, Super Valu concluded that the new store would achieve average weekly sales of $377,160, $433,734, and $471,450 in its first three years of operation. One of Super Valu's employees acknowledged that the analysis was "good, solid" and had been performed in the customary manner. Based on its extensive research and lengthy reports, Super Valu concluded that the "County Market for Anniston/Oxford looks like a winner."
Super Valu's sales projections for the Oxford County Market were incorporated into a pro forma profit and loss statement for the proposed store. Before this dispute arose, Super Valu generated its pro forma profit and loss statement for the purpose of deciding whether to enter a contract with Peterson. Super Valu's own pro forma *332 statement projected profits of $124,684, $619,267 and $750,198 during the first three years of operation of the Oxford County Market. Super Valu's director of market analysis expressly acknowledged that this pro forma statement was "reasonable" and saw no reason to challenge its bottom line figures.
As already stated, Peterson's market expert relied on Super Valu's pre-dispute profit projections and extrapolated those figures through the full term of the 15-year lease. The projected profits for the 15-year lease term totaled over $19 million. Peterson's market expert testified that the profit projections provided a "reasonably certain" basis for calculating lost profits for the Oxford County Market.
The sophistication of these projections of lost profits, we believe, equals or exceeds that of the projection methodology approved by this Court in Morgan v. South Central Bell Tel. Co., 466 So.2d 107 (Ala. 1985). In Morgan, one of the plaintiffs, who had some qualifications as a statistical researcher, conducted a survey that consisted of asking "full-mouth surgery patients" whether they had come to the offices as a result of Dr. Speed's Yellow Pages advertisement. During the first week of the three-week sample, one of five new patients came because of the ad; during the second week, it brought two of six; and during the third week, it brought two of seven. Plaintiff thus concluded that 1.6 patients per week came because of the ad, and multiplied this by 48 weeks, and by the $700 "normal fee," producing a total 1978 loss of $55,760. An expert in statistical research examined plaintiff's survey and opined that it was "reliable" and that the sample of people was large enough that the inferences could be projected onto plaintiffs' total number of patients. Plaintiffs' expert concluded that "Dr. Morgan's data were reasonable and the projections derived from the data were reasonable." After reviewing plaintiff's evidence of lost profits, this Court concluded that the evidence provided a reasonable basis for the jury to approximate the damages sustained.
The differences between the Morgan evidence and the Super Valu evidence demonstrate that the Oxford County Market profit projections were far stronger and far more supportive of the verdict than the Morgan evidence.
We are of the opinion that the jury verdict of $5 million was supported by credible evidence.

V
The fifth issue presented is whether the trial court erred when it submitted Peterson's fraud claims to the jury. Peterson's fraud claims are based on a statement that he claims was made by his Super Valu supervisor, Hoffman. Peterson testified that he received a demand letter from Hardin on February 14 and that he called Hoffman at Super Valu headquarters and told him about the letter. He testified that after he told Hoffman about the letter, Hoffman told him "we will take care of it up here."
Super Valu contends principally that Peterson failed to prove that he reasonably relied on the statement. Of course, reliance upon an alleged misrepresentation is an essential element of a fraud claim, and the person claiming injury must show that his reliance was reasonable under the circumstances. Super Valu also contends that there was no evidence of intent to defraud, another essential element in a fraud claim. Super Valu claims that there was not a scintilla of evidence showing an intent not to go forward in accordance with the statement allegedly made to Peterson by Hoffman. Finally, Super Valu contends that there was no evidence of any damage to Peterson as a result of Super Valu's alleged misrepresentation. It argues that there was no evidence whatsoever of damages resulting to Peterson by any reliance on Hoffman's alleged statement regarding "taking care of" the matter during the relevant time frame.
We cannot agree with Super Valu that there was no evidence that Peterson relied on Hoffman's statement that they would take care of the matter. There was *333 testimony also that Peterson relied, to his detriment, on Super Valu's misrepresentations. Peterson testified that had Super Valu told him the truth, he would have immediately hired an attorney to protect his interests. Peterson also testified that he expended great amounts of time, energy, and money in undertaking the necessary actions to properly equip, staff, and outfit the store in anticipation of its construction and opening. Of course, the evidence seems clear that Peterson gave up his $100,000 per year job with Super Valu, based upon the representations made to him by Super Valu. Peterson testified that had he been honestly told in February 1984 that an enormous controversy was developing over the new store, and that he would not "be taken care of" by Super Valu, he would not have quit his job.
In this connection, it should be noted that this Court has repeatedly sustained similar claims of reliance in fraud cases. For example, as was pointed out in Pugh v. Kaiser Alum. & Chem. Sales, Inc., 369 So.2d 796 (Ala.1979), this Court has "approved an action for fraudulent misrepresentation where the plaintiff proved that the defendant induced him to forgo a business opportunity." 369 So.2d at 797, citing Cities Serv. Oil Co. v. Griffin, 357 So.2d 333 (Ala.1978). Similarly, in Winn-Dixie Montgomery, Inc. v. Henderson, 353 So.2d 1380 (Ala.1977), an employee was promised another business opportunity with his employer and undertook preparations in reliance on his employer's promise. This Court held that plaintiff's proof of reliance was adequate. If Peterson had done nothing else, his resignation as president of the Anniston Division was more than sufficient reliance. See Hollis v. Warehouse Groceries Management, Inc., 481 So.2d 374, 376 (Ala. 1985); Pugh v. Kaiser Alum. & Chem. Sales, Inc., 369 So.2d at 797.
The evidence also shows that the jury could have found that Peterson's reliance on Super Valu's promise to take care of the matters raised in the Hardin letter was reasonable. First, there was testimony that Peterson had been an outstanding employee of Super Valu for 24 years, and the jury could infer that he would have, based on this long association, trusted the assurances of his corporate employer. Second, the evidence shows that the jury could have found that Peterson had a right to believe and rely on the word of his own supervisor. The evidence shows that, when informed of the problem relating to the mutual interests of Super Valu and a longtime trusted employee who had been tapped to be a new Super Valu retailer, Peterson's supervisor assured Peterson that Super Valu would handle everything. Third, there was evidence that Super Valu characterized its relationship with its retailers as a partnership. The jury could have concluded that, as the planned operator of the County Market, Peterson had a right to reasonably rely upon the statements made by his employer, Super Valu. Fourth, there was evidence that after Peterson received this assurance, he was not informed of Super Valu's activities with regard to the Hardin-Oxford County Market controversy. In other words, the jury could have determined that Peterson was kept in the dark by the very people he trusted, and that he thus learned no further facts which would have compelled him to take action to protect his own interest, until it was too late. We believe the jury was entitled to find that Peterson's reliance upon Super Valu's statement was reasonable under these circumstances.
The issue of a defendant's intent to deceive, of course, is a matter "peculiarly within the province of the trier of facts." Walker v. Woodall, 288 Ala. 510, 513, 262 So.2d 756, 759 (1972). In proving a defendant's intent to deceive, a plaintiff may meet this burden by circumstantial evidence. Marshall Durbin Farms, Inc. v. Landers, 470 So.2d 1098 (Ala.1985). This Court has held that a plaintiff may establish intent to deceive through circumstantial evidence relating to events occurring after the representation was made. See, Southeastern Properties, Inc. v. Lee, 368 So.2d 288 (Ala. 1979). In Mall, Inc. v. Robbins, 412 So.2d 1197, 1200-01 (Ala.1982), this Court held that the defendant's actions after the misrepresentation supported "the jury's finding that [the defendant] possessed the requisite *334 present intent to deceive with respect to a future event."
There is ample evidence of events both before and after Super Valu's misrepresentation of February 14, 1984, from which the jury could infer that Super Valu had an intent to deceive when it represented that it "would take care of" Peterson's interests. The evidence reveals that on three separate occasions Peterson asked Hoffman's permission to publicly announce his new status as the Oxford County Market retailer, and that each time Peterson was directed not to make any such announcement. There was also evidence that Super Valu concealed from Peterson certain meetings its representatives had with Hardin in early 1984 that directly affected both Peterson's interest in the Oxford County Market and his interest in the Hardin lawsuit, and that Super Valu knew, as early as 1984, that Hardin was threatening suit and that Peterson was a prime target. There was also evidence that Peterson was not informed of Hardin's remarks until after the date of the Hardin demand letter, and that in March 1984 a meeting was once again held between representatives of Super Valu and Hardin. At this meeting, according to the evidence, Cashin proposed that Super Valu not develop the Oxford site. Peterson testified that he was never told of the meeting; nor did Super Valu reveal to him its proposal that it not develop the Oxford site.
We are of the opinion that the evidence clearly justified the jury's determination that Super Valu did not intend to "take care of" the Hardin matter and to protect Peterson's interest at the time the representation was allegedly made.
Peterson's evidence in this case easily satisfies the legal standard of proof of damages in a fraud claim, another element which Peterson was required to prove. This Court has explained that an expanded proximate causation standard applies in fraud cases:
"[I]n cases of intentional or aggravated acts there is an extended liability and the rules of proximate causation are more liberally applied than would be justified in negligence cases. This is especially true in cases of fraud.... In those instances where the defendant is found to have acted intentionally it is proper that a more remote causation result in liability than would be true in negligence cases. The policy to be followed is that liability should fall on the wrongdoer rather than to permit the victim to go uncompensated."
Shades Ridge Holding Co. v. Cobbs, Allen & Hall Mortgage Co., 390 So.2d 601, 607 (Ala.1980). In a decision consistent with this standard, the 11th Circuit Court of Appeals recently explained Alabama damages principles applicable to fraud claims:
"In Alabama, one injured by fraudulent representation is entitled to recover all damages which were in the contemplation of the parties or which were either necessary or natural and proximate consequences of the fraud. Ala.Code § 6-5-101 (1975); Fidelity and Casualty Co. v. J.D. Pittman Tractor Co., 244 Ala. 354, 13 So.2d 669 (1943); Jackson Co. v. Faulkner, 55 Ala.App. 354, 315 So.2d 591 (1975).... Lost profits may be included in properly recoverable damages in a fraud action, but the jury must also decide if evidence shows that other damages have been incurred and that they proximately resulted from the defendant's actions."
P & S Business Machines, Inc. v. Olympia U.S.A., Inc., 707 F.2d 1321, 1323-24 (11th Cir.1983). Alabama law is, of course, clear that if the plaintiff shows that he sustained actual damages as a result of the fraud, even though the exact amount may not be shown, the plaintiff is entitled to recover nominal damages, and, where appropriate, punitive damages. Maring-Crawford Motor Co. v. Smith, 285 Ala. 477, 233 So.2d 484 (1970).
A review of the record reveals that as a result of Super Valu's fraud, the jury could have found that Peterson not only retired from his position as Anniston Division president, which was worth $100,000 a year, but never received the Oxford County Market with its $19,000,000 of projected profits for the 15-year life of Super Valu's lease commitment. As already pointed out, the *335 evidence showed that after being assured that Super Valu would take care of his interests, Peterson expended time, energy, and money in undertaking the necessary actions to properly equip, staff, and outfit the County Market, and that in reliance on Super Valu's misrepresentation, he failed to contact Mary Hardin and refrained from hiring an attorney immediately. He became a defendant in a $13 million lawsuit, and was ultimately prevented from receiving the Oxford County Market. This evidence was sufficient for the jury to find that Peterson suffered damages because of the alleged misrepresentations made to him.

VI
The sixth issue presented is whether the fraud claim and the contract claim were properly submitted to the jury. Super Valu contends that the trial court erred when it entered a judgment on the general verdict in favor of Peterson in the amount of $5,000,000. Super Valu contends that the fraud claim was specifically challenged by motion for directed verdict; therefore, Super Valu argues, under City of Huntsville v. Certain, 453 So.2d 715 (Ala.1984), cert. denied, 472 U.S. 1027, 105 S.Ct. 3499, 87 L.Ed.2d 631 (1985), a general verdict cannot stand, because, it says, the fraud claim was not supported by the evidence. Of course, we have already determined this issue adversely to Super Valu.
The legal principle governing the sixth issue has been explained by this Court, as follows:
"If a complaint has more than one count and the defendant believes that the evidence is not sufficient to support one or more of those counts, he must challenge this by motion for directed verdict, specifying the count which is not supported by evidence and detailing with specificity the grounds upon which the particular count is not supported by the evidence. If this is not done and all counts go to the jury and a general verdict is returned, the court will presume that the verdict was returned on a valid count."
Aspinwall v. Gowens, 405 So.2d 134, 138 (Ala.1981).
The general verdict in this case must stand for two reasons. First, Super Valu's motions for directed verdict failed to satisfy the Aspinwall requirements of "detailing with specificity the grounds upon which the particular count is not supported by the evidence." In its motion for directed verdict, Super Valu committed the same error as the Aspinwall defendant and "did not preserve error as to the [fraud and contract claims] because the insufficiency of the evidence was not argued with sufficient specificity." 405 So.2d at 138. Super Valu did not file a motion for a directed verdict as to the fraudulent concealment claim. Super Valu did not raise the general insufficiency of the evidence as a ground in support of its motion for a directed verdict as to the contract claim, or as to the misrepresentation or deceit claim. Regarding the misrepreentation or deceit claim, Super Valu failed to raise specifically the issue of reliance. Since Super Valu failed to detail with specificity the grounds upon which Peterson's claims were not supported by the evidence, this Court "will presume that the [general] verdict was returned on a valid count." Aspinwall v. Gowens, 405 So.2d at 138.
Second, even assuming that Super Valu satisfied the Aspinwall requirements, this general verdict cannot be set aside, because the contract and fraud claims were supported by far more than sufficient evidence to be presented to the jury.

VII
Seventh, Super Valu contends that the trial court erred when it excluded from evidence a release executed by the Hardins, releasing Peterson and Super Valu from all claims which they may have had against him. Super Valu alleges that the release was highly relevant to prove that if Hoffman (Super Valu's representative) made the statement to Peterson, then Super Valu did what Hoffman said it would do, by "taking care of" the Hardin matter. Super Valu contends that the release proves that there was no misrepresentation by Super *336 Valu and that there were no damages to Peterson.
Eighteen days after commencement of the trial in this case, Super Valu's attorneys revealed that Super Valu had obtained a release of Peterson from Hardin on May 9, 1985, in conjunction with Hardin's release of Super Valu. On May 9, the trial court also entered summary judgment in favor of Peterson on Hardin's claims. When Super Valu revealed the existence of the release in the middle of this trial, its apparent reason was to attempt to show that it had been responsible for Peterson's dismissal from the Hardin suit.
The attorneys and the trial court discussed extensively Super Valu's offer of the release at trial, and we see no value in setting out this discussion. We are of the opinion that the trial court was of the opinion that it was Peterson's motion for summary judgment, not the release, which caused Peterson's dismissal from the Hardin suit. At the time Peterson was dismissed from the Hardin lawsuit, he was represented by his own counsel. We are of the opinion, therefore, that the trial court did not err in holding that the release should not be admitted.

VIII
The eighth issue presented is whether the trial court erred when it charged the jury on punitive damages. Super Valu contends that the court erred in allowing the jury to consider the subject of punitive damages because there was no evidence upon which an award of punitive damages could be based. In Alabama, Super Valu argues, punitive damages may be awarded only if the fraud is gross, oppressive, committed with intent to injure, or aggravated.
It is well settled law in this state that if the evidence establishes an intent to deceive or defraud, then punitive damages are available. American Honda Motor Co. v. Boyd, 475 So.2d 835 (Ala.1985).
After examining the record, and the evidence, much of which is digested above, we are of the opinion that the evidence was sufficient to support a jury finding of an intent to deceive or defraud, and that the trial court properly submitted the issue of punitive damages to the jury.

IX
Ninth, Super Valu contends that the trial court's action in refusing to allow it to present the defense of the Statute of Frauds was clearly an abuse of discretion and in conflict with this Court's clearly enunciated requirement that the court allow an amendment unless there is a showing of actual prejudice by the amendment.[3] Super Valu claims that Peterson had abundant notice of the Statute of Frauds defense. It argues that the Statute of Frauds was specifically pleaded in its answer and that it was set forth and argued in response to Peterson's motion for summary judgment.
Trial judges have discretion to allow or refuse amendments to pre-trial orders. Arfor-Brynfield, Inc. v. Huntsville Mall Associates, 479 So.2d 1146 (Ala. 1985). The trial court should not allow amendments to pre-trial orders where the trial will be unduly delayed or the opposing party unduly prejudiced. Metropolitan Life Ins. Co. v. Sullen, 413 So.2d 1106 (Ala.1982). In Alabama Farm Bureau Mut. Cas. Ins. Co. v. Guthrie, 338 So.2d 1276 (Ala.1976), this Court upheld the denial of a belated amendment to add another defense, noting that the defendant had had ample time to review the complaint and prepare a response. In Vernon Carpet Mills, Inc. v. Rossville Spinning Corp., *337 344 So.2d 1205 (Ala.1977), this Court affirmed the trial court's exercise of discretion in rejecting an amended answer filed four days before trial.
The trial court did not abuse its discretion when it refused to allow Super Valu to present its Statute of Frauds defense. Super Valu had many opportunities prior to the pre-trial order to raise its Statute of Frauds defense. Super Valu failed to raise this defense in a detailed six-page statement of position on the issues. This statement, submitted at the court's insistence, made no reference whatsoever to the Statute of Frauds. With ample time to assess the desirability of raising the Statute of Frauds, Super Valu apparently decided to omit this defense as to Peterson, although it expressly included this defense against Hardin in the very same statement. After submitting their respective statements of position, the parties thoroughly reviewed all the issues at the lengthy pre-trial conference. Super Valu again failed to assert the defense against Peterson. Super Valu thereafter filed a revised statement of position, again not asserting that Peterson's claim was subject to the Statute of Frauds. From the time it filed its amended statement until a summary judgment hearing two days before trial, a period of 100 days, Super Valu made no mention of the Statute of Frauds in relation to Peterson's claim.
It is clear that Peterson would have been unduly prejudiced had the trial court allowed Super Valu to assert the Statute of Frauds as a defense. Peterson had not taken any depositions concerning the Statute of Frauds and had not requested any documents on the issue. Interrogatories, filed immediately after the pre-trial conference, did not inquire into the Statute of Frauds defense, since this defense was not included in Super Valu's two statements of position or in the pre-trial order. Super Valu had five months to anticipate the defense, but the first suggestion of the possibility that Super Valu would attempt to raise the issue occurred only two working days prior to trial.
The trial court's denial of Super Valu's motion to amend the pre-trial order was clearly a discretionary ruling. The trial court carefully reviewed the transcript from the summary judgment hearing and determined that Peterson's position revealed no anticipation of, or preparation for, the Statute of Frauds defense. Because of the prejudice to Peterson and the untimely nature of the motion, the trial judge clearly did not abuse his discretion.

X
The tenth issue presented is whether the trial court's exclusion of documents and testimony relating to other stores was an abuse of discretion. Super Valu contends that the trial court erred when it refused to allow testimony regarding the actual experience of stores similar to the proposed County Market insofar as meeting sales and profit projections was concerned. Super Valu states that a party has a fundamental right to introduce evidence which is competent, otherwise admissible, and relevant to the material issues being tried. It is Super Valu's position that the evidence which it attempted to introduce met these criteria.
On a number of occasions, Super Valu offered testimony regarding the actual experience of stores similar to the proposed County Market insofar as meeting sales and profit projections was concerned. The trial court ruled that this testimony concerning the Montgomery County Market and other price impact stores in Alabama, such as the Mega Market in Birmingham, would not be allowed into evidence. The court allowed testimony that both of the stores did not achieve their projected sales, but would not allow specific testimony of their actual or projected sales figures. The trial court also restricted testimony regarding the experiences of other price impact stores.
There is an additional reason why the trial judge did not err here. The pre-trial order required Super Valu to exchange, in advance of trial, all exhibits it intended to submit at trial. The parties exchanged thousands of documents prior to *338 trial. The profit projections and actual profit data on the Montgomery County Market and on the Mega Market in Birmingham were not exchanged prior to trial, as the pre-trial order required. We are, therefore, of the opinion that the trial judge did not abuse the discretion vested in him, particularly since his pre-trial order warned the parties of the consequences of any violations of his pre-trial order. See, Hughes v. Arlando's Style Shop, 399 So.2d 830 (Ala.1981).
Admission of these proposed exhibits, and oral testimony relating thereto, would have caused Peterson considerable hardship. The financial statements in question related to other hand-picked stores, located in other geographic markets, and subject to other competitive and economic situations. Peterson was totally unprepared to distinguish such factors and minimize the impact of these unrelated financial statements. Notwithstanding this hardship to Peterson, the court did allow Super Valu's witnesses to state that the actual profits of the Mega Market were lower than its profit projections. The real thrust of Super Valu's defense theorythat profit projections are not accuratewas, therefore, allowed into evidence. Consequently, no error to reverse is shown here.

XI
The eleventh issue presented is whether the trial court erred when it refused to allow one Craig Anderson to testify. Super Valu sought to call Craig Anderson as a witness to rebut the testimony of Peterson's expert, Roger Walker. Peterson's attorney objected to Anderson's being called as a witness, based upon the Court's pre-trial order, which provided:
"Witnesses offered solely for purposes of rebuttal or impeachment, the necessity for whose testimony could not reasonably be anticipated in advance, need not be listed; every party, however, is under the continuing duty to inform the court and all other parties of his intention to call any such rebuttal or impeachment witness as soon as the need becomes reasonably apparent."
Super Valu contends that this action by the trial court was an abuse of discretion, because Super Valu was prevented from utilizing an available and necessary rebuttal witness, although no prejudice to Peterson was shown from allowing Anderson to testify. Super Valu argues that a pre-trial order is not intended to prevent the full admissibility of otherwise admissible evidence when no prejudice to the opposing party is shown.
The entire purpose of the pre-trial order is to "control the subsequent course of the action." Rule 16, Ala.R.Civ.P. Such control necessarily extends to limitations on expert witnesses, which are expressly contemplated by Rule 16. The refusal to permit expert witnesses to testify because of a party's failure to comply with the pre-trial order is clearly a matter of discretion, not subject to reversal. Electrolux Motor AB v. Chancellor, 486 So.2d 414 (Ala.1986).
Super Valu contends that the trial judge abused his discretion because Super Valu dutifully disclosed Anderson's identity as an expert rebuttal witness two days after his appearance at trial was confirmed by Super Valu. The record makes it clear, however, that the trial judge could have found that the need for Anderson's testimony became "reasonably apparent" one month before trial, immediately after the deposition of Peterson's expert, Roger Walker. Super Valu's counsel admitted that it first contacted Anderson, a former employee of Walker's, about three weeks before Anderson appeared at trial. Numerous contacts followed in the next three weeks. Anderson testified that he informed Super Valu one week before it attempted to call him to testify that he would "probably come," but that he "committed" to testify on Tuesday, July 30, 1985. Super Valu still did not disclose his identity until moments before it attempted to call him.
Super Valu's sole basis for not disclosing Anderson's identity sooner was that it did not have a firm commitment that he would testify. We cannot say that this might not be a good ground under differing *339 facts, but we cannot hold, in this case, that the trial judge erred by not allowing Anderson to testify.

XII
The final issue presented for our review is whether the trial court committed reversible error by commenting on the evidence in the presence of the jury. Super Valu contends that a comment by the trial court, to the effect that Food World's competitive response to the hypothetical County Market had no bearing on the issues in the case, undermined the position of Super Valu. Super Valu alleges that in commenting on the evidence, the court committed reversible error, as the jury, not the court, is granted the important and exclusive right of weighing the evidence.
The allegedly prejudicial comment came at the conclusion of a line of questions on cross-examination relating to Peterson's potential response to hypothetical price-cutting by a Food World store. Peterson initially stated his anticipated response to hypothetical price-cutting by a Food World store. Peterson initially testified concerning his anticipated response if Food World cut its gross profit margin to ten percent. He then articulated his anticipated response if that store cut its gross profit margin to nine percent. At a hypothetical gross profit margin of eight percent, however, Peterson's counsel objected to this testimony. The court sustained the objection, stating:
"Gentlemen, Gentlemen. What Food World may or may not do I think has little bearing on the issues at hand. I would sustain the objection."
Even assuming this constituted a comment on the evidence as opposed to a statement of the reason for his ruling, it is well settled that a trial judge's comment on the evidence justifies reversal only if it causes "discernible prejudice." Russellville Flower Craft, Inc. v. Searcy, 452 So.2d 478, 482 (Ala.1984).
The short statement made by the trial judge, directed to counsel, in the context of a proceeding spanning over 3,000 pages of transcript, could not, in our opinion, have caused "discernible prejudice" to Super Valu. Even if the court's isolated remark to counsel, standing alone, could somehow be deemed prejudicial, the court immediately cured any possible problem, with the following instruction:
"Ladies and Gentlemen, I would charge you that what the court said had no bearing upon the fact that they might very well be very competitive in the market. It simply was directed at the question then posed."
The court's explanation of its statement makes it clear that the comment was merely one of relevance concerning the specific question at hand. Just prior to the curative instruction, the court had reiterated, in the presence of the jury, "I am not commenting upon the fact they may not be competitive in the market. I make my statement in respect to the question that you are asking." Given the court's clarification of its ruling as one of relevance, its immediate curative instruction, its jury charge, and the nature of the statement in the context of over 3,000 pages of trial transcript, we are of the opinion that Super Valu could not have suffered "discernible prejudice."
The judgment of the trial court is due to be, and it hereby is, affirmed.
AFFIRMED.
TORBERT, C.J., and JONES, ALMON, SHORES, BEATTY, ADAMS and STEAGALL, JJ., concur.
HOUSTON, J., concurs as to Issues II, III, V, VI, VIII, IX, and XI.
HOUSTON, J., concurs in the result as to Issues I, IV, VII, X, and XII.
NOTES
[1] The pertinent part of the letter of April 13, 1984, is previously set forth in the fourth paragraph of Part I.
[2] The letter of May 18, 1984, states, in pertinent part:

"In part, to confirm the telephone conversation between my law partner, A.W. Bolt, and yourself, on Friday, May 18, as well as to further inform you as to Mr. Peterson's position at present, please accept the following:
"Our previous offer of compromise to you on Monday, May 14, is now withdrawn and no offers are presently outstanding. Moreover, our demand for you to immediately proceed with appropriate action in order to begin construction on the store site is withdrawn at the present time. This withdrawal is made without any prejudice to any later action which Mr. Peterson may elect to take in order to protect his interest. Specifically, Mr. Peterson does not waive the right he has to force Super Valu to expeditiously proceed forward with the store plans at some point in the future.
"Additionally, please be again advised of our position that Mr. Peterson has an unequivocal [sic] and irrevocable right to the Oxford store and a contractual obligation is clearly present between Super Valu and Mr. Peterson regarding this store and location."
[3] Super Valu presented its Statute of Frauds defense as follows:

"This document is invalid under Code of Alabama 1975, § 8-9-2, the Alabama Statute of Frauds, which requires that the document affecting an interest in real estate be signed by the party to be charged therewith or an agent having written authority to bind the party." Super Valu contended that its agent, Dennis L. Weubker, lacked written authority to bind Super Valu to a contract affecting an interest in land (lease agreement with Peterson), and, therefore, that the contract between Super Valu and Peterson was void.